# Supreme Court of Wisconsin

| | |
|---|---|
| CASE NO.: | 2021AP419 |

| | |
|---|---|
| COMPLETE TITLE: | In the interest of X. S., a person under the age of 18:<br><br>State of Wisconsin,<br>      Petitioner-Appellant,<br>   v.<br>X. S.,<br>      Respondent-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 323, 964 N.W.2d 553
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 29, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 9, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Brittany C. Grayson |

JUSTICES:
ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a concurring opinion in which ROGGENSACK and REBECCA GRASSL BRADLEY, JJ. joined. HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-respondent-petitioner, there were briefs filed by *Christopher P. August*, assistant state public defender. There was an oral argument by *Christopher P. August*.

For the petitioner-appellant, there was a brief filed by *Lisa E.F. Kumfer*, assistant attorney general, with whom on the

brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Lisa E.F. Kumfer*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2021AP419
(L.C. No. 2020JV663)

STATE OF WISCONSIN   :   IN SUPREME COURT

**In the interest of X. S., a person under the age of 18:**

**State of Wisconsin,**

  **Petitioner-Appellant,**

  **v.**

**X. S.,**

  **Respondent-Respondent-Petitioner.**

**FILED**

**JUN 29, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, and KAROFSKY, JJ., joined. ZIEGLER, C.J., filed a concurring opinion in which ROGGENSACK and REBECCA GRASSL BRADLEY, JJ. joined. HAGEDORN, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Modified and affirmed and, as modified, cause remanded.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This is a review of an unpublished decision of the court of appeals, State v. X.S., No. 2021AP419, unpublished slip op. (Wis. Ct. App. July 20, 2021), reversing the decision of the Milwaukee County circuit

court[1] to deny a petition filed by the State to waive a juvenile, X.S., into adult court for criminal proceedings. The court of appeals remanded the case to the circuit court to conduct a new waiver hearing.

¶2 A mass shooting occurred at the Mayfair Mall, located outside of Milwaukee. X.S., armed with a concealed handgun, entered the mall with a friend, became involved in a confrontation with another group of four individuals, and opened fire. In the process, X.S. shot and hospitalized eight people. The victims included the friend of X.S., three individuals in the other group, and four bystanders who happened to be at the mall that day. X.S. fled the scene with the help of his family. Subsequently, he was apprehended by police. He was charged with eight counts of first-degree reckless injury with use of a dangerous weapon, contrary to Wis. Stat. §§ 940.23(1)(a) and 939.63(1)(b) (2019-20),[2] and one count of illegal possession of a dangerous weapon by a person under 18 years of age, contrary to Wis. Stat. § 948.60(2)(a). The State sought to have X.S. waived into adult court instead of remaining in juvenile court. The circuit court denied that request for waiver. The court of appeals reversed the circuit court's decision and remanded the case for a new waiver hearing.

---

[1] The Honorable Brittany C. Grayson presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

4

¶3   We affirm the court of appeals' decision to reverse the circuit court and remand the case.  However, we conclude that a new waiver hearing is unnecessary.  We conclude that the circuit court erroneously exercised its discretion by denying the State's waiver petition.  There exists no reasonable basis for denying the State's waiver petition.  Therefore, we remand the case to the circuit court with instructions to grant the State's waiver petition.

### I.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4   Over the course of several months in 2020, X.S. engaged in serious and escalating criminal behaviors, despite juvenile court interventions and court-ordered conditions.  X.S. had been previously deemed to be delinquent.[3]  He had a concerning history while in the juvenile justice system, and the amount of resources and the remaining potential time available to assist X.S. in the juvenile system was limited.  The

---

[3] Juvenile delinquency is an alternative to criminal proceedings.  Juvenile courts retain exclusive jurisdiction "over any juvenile 10 years of age or older who is alleged to be delinquent."  Wis. Stat. § 938.12(1).  In Wisconsin, a "'juvenile' . . . means a person who is less than 18 years of age," but "for purposes of investigating or prosecuting a person who is alleged to have violated a state or federal criminal law or any civil law or municipal ordinance, 'juvenile' does not include a person who has attained 17 years of age."  Wis. Stat. § 938.02(10m).  "A juvenile adjudged delinquent may be subject to, inter alia, placement in a juvenile correctional facility or juvenile portion of a county jail, forfeiture, suspension of driving privileges, counseling, supervision, electronic monitoring, restitution, supervised work or community service, or drug testing."  State v. Sanders, 2018 WI 51, ¶6, 381 Wis. 2d 522, 912 N.W.2d 16.

following facts were established through X.S.'s juvenile case records and through undisputed testimony at X.S.'s waiver hearing. As for all pretrial waiver determinations, these facts are used only to determine whether waiver into adult court is warranted, not to decide whether X.S. is guilty of a criminal offense. Under the American system of law, "[a] person when first charged with a crime is entitled to a presumption of innocence, and may insist that his guilt be established beyond a reasonable doubt." Herrera v. Collins, 506 U.S. 390, 398 (1993). By reciting and relying upon the following facts, we do not establish X.S.'s guilt beyond a reasonable doubt, nor do we impose any form of criminal liability on X.S.

¶5 In April 2020, X.S. and two of his friends, including E.G., were in a car together and were involved in a drug deal. An individual purchasing drugs from the car shot into the car and hit X.S. X.S. was taken to a nearby hospital and was treated for several days. X.S. was 15 years old at the time of the shooting.

¶6 In July 2020, three months after X.S. was shot, X.S., E.G., and another individual were driving in a car when they were pulled over by police in St. Francis. X.S. exited the vehicle and ran from the police, resulting in a foot chase with police. Police soon apprehended X.S. but recognized that X.S. had discarded a backpack during his flight. After a K-9 unit was called to the scene, police found the backpack X.S. concealed and discovered 133 grams of marijuana packaged for

distribution. Both X.S. and E.G. possessed drug trafficking tools, cash, and a scale.

¶7 The State charged X.S. with possession with intent to distribute marijuana and obstructing an officer. The charges were brought in juvenile court, and the State did not petition to waive into adult court. X.S. and the State entered into a plea agreement whereby the State dismissed and read in the possession with intent to distribute charge. X.S. was convicted of obstructing an officer. The juvenile disposition order, entered in August 2021, directed that X.S. participate in nine months of court-ordered supervision, participate in the Running Rebels Intensive Monitoring Program ("Running Rebels"),[4] complete a Global Appraisal of Individual Needs ("GAIN") assessment,[5] attend school daily, refrain from association with or participation in activities that could be deemed criminal, refrain from consuming alcohol and drugs, follow household rules, and meet as scheduled with X.S.'s assigned Human Service Worker ("HSW").

¶8 Despite the resources and services devoted to X.S. in the juvenile justice system, X.S. did not comply with the conditions included in his juvenile disposition order. On initial intake into the juvenile system, X.S. refused to

---

[4] Running Rebels Intensive Monitoring Program provides support, oversight, and mentoring to delinquent juveniles.

[5] A GAIN assessment tests the extent of an individual's drug and alcohol use. The assessment allows the juvenile justice system to best structure its treatment and services to the needs of a delinquent juvenile.

cooperate with an HSW and provide information necessary to begin his transition into supervision. After X.S.'s attorney and parents were contacted, the information was provided. Around the time when school was scheduled to begin for X.S., his HSW received a text message from X.S. offering to sell her marijuana.[6]

¶9 The beginning of school in mid-August 2020 did not improve the situation for X.S. Despite being ordered to do so and despite repeated check-ins from X.S's HSW and school social workers, X.S. did not attend class for the first several weeks of school. In mid-September, several weeks after the juvenile disposition order was entered, Running Rebels contacted the HSW to inform her that X.S. had not enrolled, received an assessment, or participated in orientation with Running Rebels. This was despite specific court-ordered directions and despite Running Rebels staff contacting X.S. Several weeks later, in early October, Running Rebels informed the HSW that X.S. had yet to complete orientation and begin the Running Rebels program. The HSW eventually got in contact with X.S. (after much effort) through his mother, notified him of Running Rebels' repeated attempts to contact him, and informed X.S. that his refusal to register for Running Rebels would result in him being subject to

---

[6] The text message stated, "Out here all day with some gas. LMK." Based on the HSW's training and experience, the HSW provided uncontested testimony that this was an offer to sell marijuana.

8

a 24-hour electronic monitoring system. The same day X.S. completed his Running Rebels orientation.

¶10 Between early October and late November 2020, X.S. continued to violate the juvenile disposition order. In mid-October, Running Rebels informed the HSW that X.S. was non-compliant, did not contact Running Rebels when he left his house, and was not participating in check-in calls. In mid-November, Running Rebels reported that X.S. had been compliant recently and was available for face-to-face contact. However, by late-November, X.S. was again not communicating with Running Rebels in violation of conditions. On numerous occasions, the HSW attempted to contact X.S. as part of his court-ordered supervision plan, and he did not answer or respond. The HSW attained X.S.'s school records, which showed that X.S. had not attended a single day of school since the start of the school year; X.S. was failing every class. After the incidents at issue in this case, X.S. admitted that he used marijuana during his time under court-ordered supervision. Further, X.S. was court ordered in August 2020 to complete a GAIN assessment. In mid-October, X.S. was given a specific referral to complete his GAIN assessment, but by the date of the shooting at issue in this case, the assessment had not been completed.

¶11 An initial screening indicated X.S. was at high risk of recidivism,[7] but screening also found that he did not have

_____

[7] The court system utilized the Youth Assessment and Screening Instrument ("YASI") to determine X.S.'s risk of recidivism.

substantial mental health needs.[8]  The HSW asked X.S. and his family on numerous occasions if they needed any assistance, if any help could be provided for X.S.'s school, and if they had any issues complying with court-ordered conditions.  X.S. and his family repeatedly said no.

¶12  On Friday, November 20, 2020, three months after X.S. entered the juvenile system, he participated in the Mayfair Mall mass shooting.  One witness described how a group of four individuals, three male and one female, were shopping at the Mayfair Mall.  Another male approached this group "screaming" and was accompanied by another male associate.  Video evidence confirmed that the first male was E.G. and the second male was X.S.  The witness described E.G. and X.S. as "looking for someone," not shopping.  When E.G. approached the group of four, X.S. reached for his waistband where the witness could observe a concealed handgun.  E.G. punched a member of the group of four, and X.S. drew the handgun.  X.S. pointed the gun at the group, who were now moving toward E.G., and X.S. opened fire.  The person who E.G. hit fell to the ground immediately; E.G. and another member of the group of four then fell to the ground.

¶13  The witness observed that X.S. was targeting the group of four.  One of the members of the group attempted to flee, and the witness observed X.S. turn and shoot at that member as the member attempted to flee.  The witness stated that there were volleys of shots, separated by time.  X.S. unloaded around 10

---

[8] The screening was conducted by Wraparound Services.

rounds, paused, and then continued shooting. The witness's account was corroborated by video evidence and the statements of other witnesses. One other witness, for instance, described E.G. punching a member of the group of four and X.S. taking a "shooter's stance" and firing a gun.

¶14 Almost immediately after the shooting began, local police received emergency calls. The first officers arrived within one minute of reports of an active shooter. By the time police arrived, X.S. had already fled the scene. The police discovered that eight people in the mall had been shot, requiring immediate medical care. All eight were taken to the hospital for treatment. It was later determined that three of the eight were members of the group of four, and one was E.G. The other four victims were bystanders who happened to be at the mall that day; they had no association or interaction with X.S. Fortuitously, none of the victims died of their injuries.

¶15 Video evidence demonstrated that X.S. fled the mall and was picked up by a car, later determined to be an Uber called by X.S.'s father. X.S. was dropped off at his home. Text messages revealed that X.S.'s family coordinated to help X.S. flee out of state, board a flight, and hide from authorities with a family member in Florida. However, that plan did not succeed. Police arrested X.S. a few days after the shooting traveling in a car and carrying the handgun used in the shooting. Forensic investigators recovered the shell casings and bullet fragments at the mall, and they were traced to the

11

handgun X.S. possessed and used. At the time of the shooting, X.S. was 15-1/2 years old.

¶16 After X.S. was detained, the State filed an amended petition for juvenile delinquency, charging X.S. with eight counts of first-degree reckless injury with use of a dangerous weapon and one count of illegal possession of a dangerous weapon by a person under 18 years of age. The petition described in detail the corroborated witness testimony of the shooting and the video evidence depicting X.S.'s involvement and flight from the scene. The day after the charges were filed, the State filed a petition to waive X.S. into adult court to face criminal prosecution. The State explained that X.S. was adjudicated delinquent in August 2020 and X.S. had failed to comply with court-ordered conditions, and reasoned that, given X.S.'s documented failures with the juvenile system, "the adult system is better able to provide appropriate accountability and address his long-term rehabilitative needs."

¶17 After a short period of discovery and psychological evaluations of X.S., the circuit court held a combined sanctions hearing for X.S.'s August 2020 case and a waiver hearing for the November 2020 case. The defense did not contest the prosecutive merit in the State's delinquency and waiver petitions.

¶18 At the hearing, X.S.'s HSW testified and described in detail his treatment progression and lack of compliance with the juvenile system. The testimony corresponded to X.S.'s past behavior and treatment history recounted above. See, supra, ¶¶5-11. Nonetheless, the HSW recommended that X.S. remain in

12

the juvenile system and concluded that the juvenile system can provide effective treatment and services.

¶19 X.S. called Dr. David Thompson as a witness. Dr. Thompson was a clinical psychologist hired by X.S. to conduct a psychological evaluation of X.S. for the waiver hearing. Dr. Thompson stated that he reviewed the delinquency petition, as well as the August 2020 juvenile disposition order. However, he did not consider X.S.'s record while on juvenile supervision, police reports of the mall shootings, and video evidence of X.S.'s actions while at the mall, specifically X.S.'s pause in shooting and his taking aim at a fleeing victim. Dr. Thompson was also unaware that X.S.'s family conspired to move X.S. out of state and escape arrest. Dr. Thompson explained in his written report that he relied on statements from X.S.'s mother to conclude that X.S. was "compliant" and had "completed" the Running Rebels program. Dr. Thompson concluded that, because X.S. had "strong social support" and a "positive attitude toward intervention and authority," X.S. was a low risk to reengage in violent behavior with treatment.

¶20 Dr. Thompson explained that X.S. reported to him emotional distress as a result of the April 2020 shooting where X.S. was shot. X.S. told Dr. Thompson that since that date, he had experienced serious episodes of paranoia, depression, and anxiety. X.S. provided Dr. Thompson a description of the mall shooting. According to Dr. Thompson, X.S. stated the four other individuals at the mall had previously threatened X.S. X.S. and E.G. were not looking for the group, but simply ran into them.

13

E.G. approached the group and punched one member, and X.S. felt threatened. Under this account, X.S. pulled out a gun, closed his eyes, and fired until the magazine was empty. Based on all this information, Dr. Thompson believed X.S. was experiencing symptoms of Post-Traumatic Stress Disorder ("PTSD"), and his needs with proper treatment could be "more than adequately addressed within . . . twelve months" within the juvenile system. X.S. offered no testimony, affidavits, or other evidence to support this account of events.

¶21 At the hearing, the State noted that most juveniles, even the most violent, spend only about six to nine months in correctional placements before they are released into the community under supervision. X.S. did not contest this description of the probable length of confinement. It was also uncontested that the most serious action that could be taken if X.S. proceeded as a juvenile was confinement in a correctional facility, which would at most last until X.S. turned 18 years old. See Wis. Stat. §§ 938.355(4)(b), 938.34(4m). Given X.S.'s birthdate and the circuit court's scheduling, any juvenile disposition order could only have been entered several months after X.S. turned 16 years old, leaving by statute less than two years as the maximum confinement period. Id.

¶22 After receiving evidence, the circuit court denied the State's petition for waiver, concluding that the State had not met its burden to waive X.S. into adult court. The State filed a petition with the court of appeals for leave to appeal the circuit court's waiver decision as a nonfinal order.

14

¶23 The court of appeals granted the State's petition for leave to appeal. In July 2021, the court of appeals reversed the decision of the circuit court and remanded the case to the circuit court to conduct another waiver hearing. State v. X.S., No. 2021AP419, unpublished slip op., ¶¶1, 30. The court of appeals reasoned that the circuit court inappropriately relied on unverified hearsay, recounted through Dr. Thompson's testimony of X.S.'s account of the mall shootings. Id., ¶18. Further, the circuit court improperly considered statements that contradicted the State's delinquency petition. Id., ¶¶19-21. According to the court of appeals, the circuit court also failed to provide adequate explanation or analysis on the seriousness of the offenses, protection of the public, the time remaining in the juvenile system, and X.S.'s familial support, specifically X.S.'s family's assistance with his escape from police after the shooting. Id., ¶¶22-29. The court of appeals concluded that the circuit court erroneously exercised its discretion. Id., ¶30.

¶24 X.S. petitioned this court for review, and we granted the petition in October 2021.

## II. STANDARD OF REVIEW

¶25 Wisconsin Stat. § 938.18 governs waiver of juvenile court jurisdiction. "The decision to waive juvenile court jurisdiction under Wis. Stat. § 938.18 is committed to the sound discretion of the juvenile court." State v. Tyler T., 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192. "We will reverse the

15

juvenile court's decision to waive jurisdiction only if the court erroneously exercised its discretion." Id. We explained the process for reviewing discretionary juvenile waiver decisions in J.A.L. v. State:

> An appellate court first looks to the record to see whether that discretion was in fact exercised. McCleary v. State, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971). Assuming discretion was exercised, the appellate court will look for reasons to sustain the trial court's discretionary decision. Loomans v. Milwaukee Mut. Ins. Co., 38 Wis. 2d 656, 662, 158 N.W.2d 318, 320 (1968). An appellate court will reverse a juvenile court's waiver determination if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record. State v. C.W., 142 Wis. 2d 763, 766–67, 419 N.W.2d 327 (1987).

162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991).

## III. ANALYSIS

¶26 We will first discuss the procedure for waiving juveniles into adult court. We will then turn to the State's waiver petition in this case. Reviewing the record and circuit court findings, we conclude that the circuit court erroneously denied the State's petition.

## A. Juvenile Court Waiver Proceedings

¶27 There are two steps in the process to waive juvenile court jurisdiction. First, "[t]he court shall determine whether the matter has prosecutive merit." Wis. Stat. § 938.18(4)(a). We have equated a determination of prosecutive merit in this context with "a determination of probable cause at a preliminary

16

examination."  P.A.K. v. State, 119 Wis. 2d 871, 884, 350 N.W.2d 677 (1984) (citing T.R.B. v. State, 109 Wis. 2d 179, 192, 325 N.W.2d 329 (1982)).

¶28 Once prosecutive merit has been found, the juvenile court advances to the second stage of the proceedings.  At the second stage, the juvenile court must determine whether to waive jurisdiction.

> [T]he court shall base its decision whether to waive jurisdiction on the following criteria:
>
> (a) The personality of the juvenile, including whether the juvenile has a mental illness or developmental disability, the juvenile's physical and mental maturity, and the juvenile's pattern of living, prior treatment history, and apparent potential for responding to future treatment.
>
> (am) The prior record of the juvenile, including whether the court has previously waived its jurisdiction over the juvenile, whether the juvenile has been previously convicted following a waiver of the court's jurisdiction or has been previously found delinquent, whether such conviction or delinquency involved the infliction of serious bodily injury, the juvenile's motives and attitudes, and the juvenile's prior offenses.
>
> (b) The type and seriousness of the offense, including whether it was against persons or property and the extent to which it was committed in a violent, aggressive, premeditated or willful manner.
>
> (c) The adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public within the juvenile justice system, and, where applicable, the mental health system and the suitability of the juvenile for placement in the serious juvenile offender program under s. 938.538 or the adult intensive sanctions program under s. 301.048.

17

(d) The desirability of trial and disposition of the entire offense in one court if the juvenile was allegedly associated in the offense with persons who will be charged with a crime in the court of criminal jurisdiction.

Wis. Stat. § 938.18(5).

¶29 Under Wis. Stat. § 938.18(6), the juvenile court

shall state its finding with respect to the criteria on the record. . . . [I]f the court determines on the record that there is clear and convincing evidence that it is contrary to the best interests of the juvenile or of the public to hear the case, the court shall enter an order waiving jurisdiction and referring the matter to the district attorney for appropriate proceedings in the court of criminal jurisdiction.

§ 938.18(6).

¶30 At juvenile waiver hearings, "common law and statutory rules of evidence are not binding." Wis. Stat. § 938.299(4)(b). "Hearsay evidence may be admitted if it has demonstrable circumstantial guarantees of trustworthiness." Id.

¶31 As we explained in State v. Kleser in the analogous reverse-waiver context, the time for the juvenile to contest the factual basis for the offenses charged is when the court makes its probable cause determination.[9] 2010 WI 88, ¶¶56-66, 328 Wis. 2d 42, 786 N.W.2d 144. Once prosecutive merit in a juvenile waiver case has been found, the juvenile cannot then contest or contradict the findings that the offenses charged

---

[9] Reverse waiver is a procedure by which juveniles "subject to the exclusive original jurisdiction of the adult criminal court" may obtain a "transfer [of] jurisdiction [from adult court] to juvenile court." State v. Kleser, 2010 WI 88, ¶¶1, 3, 328 Wis. 2d 42, 786 N.W.2d 144 (citing Wis. Stat. §§ 938.183(1), 970.032(1) and (2) (2005-06)).

18

were committed at the second stage of the proceedings. Id., ¶66 ("We see no basis for contradicting that finding after the preliminary examination except at trial."). A waiver hearing is not an opportunity to conduct a "minitrial" on the merits of the case. Id., ¶69. However, a juvenile has latitude to present supplementary evidence in order to allow the court to effectively analyze the statutory criteria under Wis. Stat. § 938.18(5), recognizing that violations of the law "[have] already been established." Id., ¶84.

B.   The State's Petition To Waive X.S. Into Adult Court.

¶32 The circuit court's decision to deny the State's waiver petition was not reasonably supported by the facts and record. Tyler T., 341 Wis. 2d 1, ¶24 (explaining that "[a] juvenile court erroneously exercises its discretion . . . if it renders a decision not reasonably supported by the facts of record"). We defer to a circuit court's exercise of discretion. However, in this case, reversal of the circuit court's decision is warranted.

¶33 Under J.A.L., we first look to "the record to see whether that discretion was in fact exercised." 162 Wis. 2d at 961. The exercise of discretion incorporates a process of reasoning and proper explanation. State v. Salas Gayton, 2016 WI 58, ¶19, 370 Wis. 2d 264, 882 N.W.2d 459 ("An exercise of discretion contemplates a process of reasoning. This process must depend on facts that are of record or that are reasonably derived by inference from the record and a conclusion based on a

19

logical rationale founded upon proper legal standards." (quotations and citations omitted)); McCleary v. State, 49 Wis. 2d at 277, 282 (holding that a circuit court that did not provide adequate reasoning or explanation for a discretionary decision "fail[ed] to exercise discretion," and explaining that "[d]iscretion is not synonymous with decision-making"); State v. Hall, 2002 WI App 108, ¶¶16-17, 255 Wis. 2d 662, 648 N.W.2d 41 (reasoning that a discretionary decision that was supported by minimal and inadequate explanation by a circuit court "reflect[ed] decision making" but not "a process of reasoning based on a logical rationale," as is required for a proper exercise of discretion (citations and quotations omitted)). The circuit court here concluded that waiver into adult court was not justified and provided a statement on the record in support of that conclusion. However, the circuit court's findings were unclear, and reading the circuit court's transcript as a whole, it is difficult to infer how the circuit court applied the facts of this case to the statutory criteria provided under Wis. Stat. § 938.18(5).[10] Nonetheless, we will assume, without deciding, that the circuit court provided sufficient reasoning and explanation to constitute an exercise of discretion.

---

[10] The circuit court in this case discussed much of the record at the waiver hearing and cited the statutory criteria. In addition, the circuit court repeatedly stated in general terms that it had heard evidence from different perspectives. However, it is not clear from the circuit court transcript how the circuit court interpreted and applied the facts in this case to the statutory factors provided under Wis. Stat. § 938.18(5).

20

¶34 Under J.A.L., "[a]ssuming discretion was exercised," we next "look for reasons to sustain the trial court's discretionary decision." 162 Wis. 2d at 961. There are several facts that may support the circuit court's decision to deny waiver into adult court in this case.

¶35 First, at the Mayfair Mall, X.S. shot three individuals in the other group with whom X.S. was engaged in a confrontation, as well as four bystanders. However, in the process, he also shot his own friend, E.G. Second, after X.S. engaged in the shootings, he contacted his family to assist him in his escape and had an Uber called to drive him away from the mall. X.S. and his family formulated a plan to flee the state after the shootings took place, and X.S. was apprehended by police a few days after the shootings. From the available record, X.S. does not appear to have created a well-developed escape plan prior to the mall shootings. Third, X.S. was diagnosed with PTSD as a result of being shot in April 2020, and the State did not challenge the validity of that diagnosis. X.S. could in the future receive treatment for any remaining mental health issues he has. Proper treatment could improve the possibility that X.S. will comply with court-ordered conditions and decline opportunities to engage in future criminal behavior. Fourth, many of the events that lay at the heart of the record in this case occurred when both X.S. and E.G. were acting together. X.S. was shot in April 2020 when he was at a drug deal with E.G.; X.S. was arrested in July 2020 for possessing with intent to distribute marijuana and obstructing an officer

21

while he was with E.G.; and X.S. participated in the shooting at the Mayfair Mall after E.G. and X.S. confronted the other group of four individuals.  It is possible X.S.'s past behavior could be attributed in part to his associations with E.G.  Fifth, between when X.S. entered the juvenile system in July 2020 and when he committed the shootings at issue in November 2020, he was in the juvenile system for around four months.  Although X.S.'s record in the juvenile system was marked by non-compliance with court-ordered conditions, there was not a long history by which a court could judge the adequacy of the juvenile system for X.S.

¶36 Under J.A.L. we "will reverse a juvenile court's waiver determination if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record."  162 Wis. 2d at 961.  We conclude that the record does not reflect a reasonable basis for denying the State's waiver petition.

¶37 The circuit court determined there was prosecutive merit, which X.S. did not contest.  Therefore, it is taken as established for purposes of analyzing the State's waiver petition that X.S. on November 20, 2020, engaged in eight acts of first-degree reckless injury with use of a dangerous weapon, in violation of Wis. Stat. §§ 940.23(1)(a) and 939.63(1)(b).  See Kleser, 328 Wis. 2d 42, ¶84.  For purposes of a waiver analysis, it is taken as established that X.S. on eight different occasions "recklessly cause[d] great bodily harm to

22

another human being under circumstances which show utter disregard for human life." § 940.23(1)(a). In addition, it is taken as established that X.S. illegally possessed a dangerous weapon on that date, in violation of Wis. Stat. § 948.60(2)(a).[11]

### 1. The Type and Seriousness of the Offenses.

¶38 The offenses X.S. is charged with demonstrate that he engaged in reckless conduct while showing an utter disregard for human life. X.S. was willing and able to carry an illegal weapon, use it, and thereby risk the lives of eight people.

¶39 Supplemental facts in the record, used "to put the offense[s] in context," only highlight the dangerousness and reckless nature of X.S.'s actions. Kleser, 328 Wis. 2d 42, ¶84. According to witness testimony, X.S. and E.G. entered a public mall on the Friday afternoon before Thanksgiving. E.G., with X.S., then confronted the group of four other individuals, consisting of three males and one female, who were shopping. E.G. assaulted one of the members of the other group. X.S. drew a concealed handgun and opened fire on the group. X.S. unloaded around ten rounds, hitting E.G. and at least two of the members of the other group. After firing, X.S. then paused, saw one of the members of the other group attempting to flee, turned his attention to this other individual, and he opened fire at that

---

[11] As we emphasized previously, at trial the State must prove these offenses beyond a reasonable doubt to establish X.S.'s guilt. See supra, ¶4. When reviewing the juvenile waiver decision at issue in this case, we do not establish X.S.'s guilt, nor do we attach any form of criminal liability to X.S.

individual.  There was no evidence or indication that anyone at the mall posed a danger to X.S., used or possessed a weapon, or threatened X.S. with serious danger.  This sequence of events was corroborated by multiple witnesses and video evidence.

¶40 Local police were asked to respond to an active shooter.  They arrived in less than one minute after the first emergency calls were made.  They identified and addressed the wounded, and one officer, Dexter Schleis, searched the mall for the shooter.  The police did not discover X.S.  Although he did not have a well-developed escape plan, X.S. chose not to surrender to authorities.  Instead, he fled the scene and attempted to escape out of state.  This resulted in a police search for an at-large mass shooting suspect.  X.S. was eventually apprehended a few days later in possession of the weapon used in the shootings.

¶41 As a result of X.S.'s actions, eight individuals received serious bodily injury with gunshot wounds.  One victim was his own friend, E.G.  Three of the victims were from the other group, and four were completely unassociated bystanders.  After the shooting, the victims were transported immediately to a hospital where they received emergency care.  As the circuit court accurately found, "it's a miracle that there were . . . no deaths."

¶42 The record highlights how X.S. carried an illegal handgun, entered a public location populated by bystanders and innocents, and opened fire.  X.S. targeted at least four members of the other group, and in fact paused, turned, and shot at one

24

member attempting to flee. At least four of the victims were shot indiscriminately and without any association with X.S. In addition, X.S. put his own, young life in serious jeopardy; as the circuit court correctly found, it is "miracle" X.S. was not shot or killed by a private citizen or police during the incidents at issue.

¶43 With the offenses and record in mind, consideration of the "type and seriousness of the offense[s]" overwhelmingly support waiver into adult court. Wis. Stat. § 938.18(5)(b). There are very few acts that are more deleterious and harmful, to individuals and society at large, than a mass and indiscriminate shooting at a place of public accommodation. Further, witnesses and video evidence confirmed that X.S. paused while he was shooting, turned toward a fleeing member of the group, and fired several rounds at that member. The facts, as shown by the delinquency petition and the record, demonstrate that X.S. acted in a "violent," "aggressive," and "willful manner" when he unloaded his handgun at the Mayfair Mall on November 20, 2020. Id.

¶44 X.S. did not submit into evidence an alternative account of the events the day of the shooting. At the waiver hearing, Dr. Thompson stated that X.S. told him that the other group of four at the mall had threatened X.S. in the past, X.S. and E.G. were not looking for the group at the mall, and X.S. simply closed his eyes and unloaded the full magazine of a handgun he carried into the mall. Putting aside the fact that closing one's eyes and firing indiscriminately in a public mall

25

is extraordinarily serious, the waiver hearing transcript indicates that the circuit court never relied on the hearsay story provided by Dr. Thompson for the truth of the matter asserted. See Wis. Stat. § 908.01(3) ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

¶45 Although out-of-court statements can be relied upon to form expert opinions, State v. Williams, 2002 WI 58, ¶28, 253 Wis. 2d 99, 644 N.W.2d 919, and hearsay is admissible at waiver hearings, to be admitted hearsay statements must have "demonstrable circumstantial guarantees of trustworthiness." Wis. Stat. § 938.299(4)(b). The circuit court did not make any findings that the story had "demonstrable circumstantial guarantees of trustworthiness" sufficient to warrant admission as hearsay statements under § 938.299(4)(b). The circuit court did cite the story as one used by Dr. Thompson to formulate his opinion, but that does not on its own constitute reliance by the court on the truth of the matters asserted. See Williams, 253 Wis. 2d 99, ¶28. On appeal, X.S. did not argue that the hearsay statements recounted by Dr. Thompson should be admitted for the truth of the matter asserted. To the contrary, X.S. repeatedly argued that the circuit court did not rely on those statements for their truth and, therefore, no hearsay concern is warranted. Therefore, while reviewing the record to determine whether there was a reasonable basis for the circuit court's decision, we do not accept the hearsay story recounted by Dr. Thompson for the

26

truth of the matter asserted. J.A.L., 162 Wis. 2d at 961. The "type and seriousness of the offense[s]" overwhelmingly support waiver into adult court. Wis. Stat. § 938.18(5)(b).

2. The Adequacy and Suitability of Juvenile Disposition.

¶46 In addition to the seriousness of the offenses, under the established record, the "adequacy and suitability" of juvenile disposition heavily favors waiver into adult court. Wis. Stat. § 938.18(5)(c). X.S. received an uncontested diagnosis of PTSD, for which he could receive treatment. In addition, X.S. may have been influenced by peer pressure from E.G. Nonetheless, it was well documented and undisputed that X.S. struggled mightily while in the juvenile system after he was caught possessing with the intent to distribute marijuana and obstructing an officer in July 2020. X.S. was given access to programs and resources to help him conform to a socially productive way of life and to avoid a life of crime. Not only did X.S. fail to take advantage of these benefits, his antisocial and criminal behavior escalated.

¶47 By court order in August 2020, X.S. was directed to participate in the Running Rebels, complete a GAIN assessment, attend school daily, refrain from association with or participation in activities that could be deemed criminal, refrain from consuming alcohol and drugs, follow household rules, and meet as scheduled with X.S.'s assigned HSW. X.S. performed poorly or outright failed to comply with almost all these conditions.

27

¶48 X.S. initially refused to participate in an intake interview, which was corrected only after his attorney and parents were made aware of possible consequences of non-compliance. Soon after entering the juvenile system, his HSW stated that X.S. texted the HSW an advertisement to purchase marijuana from him. The HSW testified that on numerous occasions, she attempted to contact X.S. in line with his juvenile supervision plan, and he did not answer or respond. By early October, X.S. had not enrolled, received an assessment, nor participated in orientation with Running Rebels as directed, despite repeated contacts from the HSW and Running Rebels' representatives. X.S. registered for Running Rebels only after the HSW threatened court sanctions. Even then, X.S. was only sporadically compliant with the Running Rebels program. For many weeks, he did not contact Running Rebels when he left his house, nor did he participate in check-in calls. Despite repeated contacts and offers of assistance from the HSW and school social workers, X.S. did not attend a single day of school from August 2020 to the date of shooting. X.S. was failing in every class in which he was enrolled. After the shootings, X.S. admitted to using drugs while on juvenile supervision, and by the date of the shootings, X.S. had not completed a GAIN assessment. As shown by the facts of the instant case, X.S. continued to associate himself with E.G. and engaged in criminal behavior while on supervision.

¶49 X.S.'s actions and history demonstrated that he was deeply unresponsive to the juvenile system while he was a

28

participant. Juvenile resources did not seem to improve X.S.'s situation, and this period under juvenile supervision culminated in a mass shooting. Although the HSW stated that X.S. could be adequately treated in the juvenile system, offering a correctional placement, the record and the HSW's own testimony conclusively contradicted the notion that X.S. was receptive to juvenile services and treatment.[12] The State contended that, in all likelihood, X.S. would at most spend six to nine months in confinement if given a correctional placement. This was undisputed before the circuit court and on appeal. By statute, the maximum length X.S. could spend at a correctional placement was up to his 18th birthday, which was less than two years. See Wis. Stat. §§ 938.355(4)(b), 938.34(4m). Given X.S.'s criminal actions at issue in this case, and his demonstrated responses to juvenile interventions in the past, the amount of confinement under consideration in this case is woefully inadequate to address X.S.'s serious needs and his risk to the public.

¶50 X.S.'s hired expert Dr. Thompson testified in favor of adjudicating X.S. as a juvenile. However, the contradictions with the record and the information Dr. Thompson did not consider placed his opinion in serious doubt. Dr. Thompson did not consider X.S.'s record while on juvenile supervision, police reports of the mall shootings, and video evidence of X.S.'s

---

[12] The HSW described in detail X.S.'s past history and failures in complying with court-ordered conditions. See, supra, ¶¶5-11. In addition, the HSW had access to a court-ordered YASI risk assessment that concluded X.S. was at high risk of reoffending.

29

actions while at the mall, specifically pausing while shooting and taking aim at a fleeing victim. Dr. Thompson reasoned, relying on self-reported statements from X.S.'s mother, that X.S. was "compliant" and had "completed" the Running Rebels program. That is undeniably false. In addition, Dr. Thompson explained that X.S. had "strong social support" and a "positive attitude toward intervention and authority." This too is completely at odds with the full record, which Dr. Thompson admittedly did not consider. Dr. Thompson himself stated on cross-examination that if he had considered the fact that X.S.'s family conspired to help X.S. flee from the police, that would present a "problem" for his favorable findings with regard to X.S.'s social support. From an incomplete picture of the facts and a series of faulty assumptions, Dr. Thompson opined that X.S.'s needs could be "more than adequately addressed within . . . twelve months" within the juvenile system. This opinion does not alter the analysis that the "adequacy and suitability" of juvenile disposition strongly favored waiver. Wis. Stat. § 938.18(5)(c).

### 3. The Personality of the Juvenile.

¶51 The "personality of the juvenile" also strongly supports waiver. Wis. Stat. § 938.18(5)(a). X.S. received a diagnosis of PTSD and may have been influenced by negative peer pressure. He nonetheless engaged in a mall shooting where he carelessly gunned down eight people. X.S. concealed an illegal handgun and, targeted, paused, and shot at a group of people with whom he had gotten into a confrontation without provocation

30

or any serious threat. After the shooting, he worked with his parents and family to devise an escape plan. All these acts were committed while X.S. was already in the juvenile system. Prior to entering the juvenile system, X.S. dealt drugs and obstructed police. Despite the access to the benefits of juvenile disposition, X.S. performed abysmally. In his time on juvenile supervision, X.S. violated almost every court-ordered condition with which he was obliged to comply, and he committed at least eight serious felonies and one misdemeanor. Through Running Rebels, GAIN assessment, school social workers and teachers, and access to a HSW and an overseeing juvenile court, X.S. was given the opportunity to receive support, obtain any needed help, and put his life on a path to becoming a productive member of society. X.S. was completely unreceptive to these resources. Given the evidence currently available, his "pattern of living, prior treatment history, and apparent potential for responding to future treatment" heavily weighed in favor of waiver. Id.

### 4. The Prior Record of the Juvenile.

¶52 As thoroughly explained above, X.S.'s "prior record" supports waiver into adult court. Wis. Stat. § 938.18(5)(am). X.S. was not previously waived into adult court, and before he committed a mass shooting, his prior record did not include acts of violence. Further, X.S.'s motives and attitudes may have been influenced by his association with E.G. However, at the waiver hearing, it was undisputed that in April 2020, he was in a drug deal with two of his friends and was shot. In July 2020,

31

he was arrested for distribution of marijuana and obstructing an officer, and he was brought into the juvenile system. He pleaded guilty to the obstruction charge. The marijuana distribution charge was dismissed but read in. In August 2020, X.S. was court ordered to comply with conditions of supervision, to participate in a number of services, and to attend school. During his time in the juvenile system, X.S.'s record demonstrates that he engaged in criminal behavior and violated his conditions of supervision in numerous ways. According to X.S.'s records and testimony at the waiver hearing, X.S. still used drugs, his text to his HSW indicated that he continued to deal drugs, he refused to attend any classes at school, and he was largely non-responsive to professionals at Running Rebels and the juvenile system which sought to give him help and support. After all this, he participated in a mass shooting and attempted to flee the state, while still on supervision. X.S.'s escalated criminal activity and non-compliance with court orders and programming in the juvenile justice system is nothing short of frightening. His "prior record" demonstrates that juvenile court is inadequate to address X.S.'s behaviors, needs, and predispositions, and that adult adjudication can best ensure the protection of the public and the safe reintroduction of X.S. into society.[13] Id.

---

[13] Because X.S. was not "associated in the offense with persons who will be charged with a crime in the court of criminal jurisdiction," Wis. Stat. § 938.18(5)(d) is not applicable.

32

¶53 Appellate courts defer to the discretionary decisions of circuit court judges, who are in the best position to observe the facts and apply the law. Tyler T., 341 Wis. 2d 1, ¶24. But while a circuit court's discretion is broad, it is "not unlimited." Salas Gayton, 370 Wis. 2d 264, ¶24; Hartung v. Hartung, 102 Wis. 2d 58, 66-69, 306 N.W.2d 16 (1981) ("[T]he exercise of discretion is not the equivalent of unfettered decision-making."). It has been long established that circuit courts must exercise their discretion within the bounds of reasonable decision-making. Tyler T., 341 Wis. 2d 1, ¶24. We cannot search the record to find reasons to overturn circuit courts' discretionary decisions. Id. ("In reviewing the juvenile court's discretionary decision to waive jurisdiction, we look for reasons to sustain the court's decision."). However, we cannot stand by while discretionary decisions falling outside the bounds of reasonable action are executed and enforced in this state. See J.A.L., 162 Wis. 2d at 961 ("An appellate court will reverse a juvenile court's waiver determination if . . . the record does not reflect a reasonable basis for the determination."). As an appellate court, to sit back and allow the implementation of wholly unjustified orders would be as great a misuse of our judicial role as would be the overriding of discretionary decisions simply due to a lack of comfort, or mere disagreement with those decisions. See Casper v. Am. Int'l S. Ins. Co., 2011 WI 81, ¶30, 336 Wis. 2d 267, 800 N.W.2d 880 (explaining that when reviewing a circuit court's exercise of discretion "we do not look to whether this court

33

would or would not have granted relief but rather whether the circuit court [erroneously exercised] its discretion").

¶54 We have a duty as appellate courts to review lower court decision making, just as lower courts have an obligation to reasonably exercise their discretion. If lower courts erroneously exercise their discretion, we have the responsibility to intervene. See, e.g., Miller v. Hanover Ins. Co., 2010 WI 75, ¶48, 326 Wis. 2d 640, 785 N.W.2d 493 (reasoning that a circuit court's discretionary decision to deny a motion for relief from default judgment because it was "not reasonable in light of the extraordinary circumstances present," despite the fact that the defendant was already a named and noticed party in the lawsuit, the defendant received several notices of the action, including to the defendant's registered agent, and the defendant's attorney of record told the plaintiff in a letter he represented the defendant as to an unrelated issue); Martindale v. Ripp, 2001 WI 113, ¶¶46-73, 246 Wis. 2d 67, 629 N.W.2d 698 (holding that a plaintiff had set an adequate foundation for expert testimony, the expert was professionally competent to testify in the area, and the expert testimony met a reasonable degree of medical probability, despite circuit court findings with factual citations to the contrary); Hartung, 102 Wis. 2d at 66-69 (concluding that a circuit court erroneously exercised its discretion by awarding alimony and child support at 27 percent of the payor's income and limiting alimony for 18 months, even recognizing that there is an interest in ensuring self-sufficiency, that it was unrealistic for the payor to

afford payments without the recipient beginning some form of work, and that the payor and recipient signed a divorce agreement in consideration for the stated alimony); McCleary, 49 Wis. 2d at 278-86 (holding that a nine-year sentence for forging a $50 check was an erroneous exercise of discretion by relying in part on the defendant's testimony and the weaknesses of a professional report favoring the sentence, despite the fact that the circuit court believed the defendant's explanation was not credible and that the defendant thought he was above the law and lacked a sense of responsibility).

¶55 The facts of this case are extreme, and the circuit court's decision is distinctly out of the ordinary: it is erroneous. Considering the criteria enumerated under Wis. Stat. § 938.18(5), the record reasonably supports only the conclusion that there is "clear and convincing evidence that it is contrary to the best interests of the juvenile [and] the public to hear the case" in juvenile court. § 938.18(6); Tyler T., 341 Wis. 2d 1, ¶24. While we are hesitant to overturn a discretionary decision of a circuit court, the circuit court's

35

decision below to deny the State's waiver petition cannot be upheld.[14]

## IV. CONCLUSION

¶56 We affirm the court of appeals' decision to reverse the circuit court and remand the case. However, we conclude that a new waiver hearing is unnecessary. We conclude that the circuit court erroneously exercised its discretion by denying the State's waiver petition. There exists no reasonable basis for denying the State's waiver petition. Therefore, we remand the case to the circuit court with instructions to grant the State's waiver petition.

*By the Court*.—The decision of the court of appeals is modified and affirmed and, as modified, the cause remanded to the circuit court.

---

[14] After the court of appeals reversed the circuit court, X.S. filed a motion for reconsideration. The court of appeals denied the motion for reconsideration without providing reasoning. Before this court, X.S. argues that the court of appeals erroneously exercised its discretion in denying the motion for reconsideration without providing explanation. Even if we assume without deciding that the court of appeals erroneously exercised its discretion by failing to give adequate reasoning, we will not reverse the court of appeals' decision. As a matter of law, the court of appeals' decision was correct on the merits. See Peplinski v. Fobe's Roofing, Inc., 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995) ("While the basis for an exercise of discretion should be set forth in the record, it will be upheld if the appellate court can find facts of record which would support the [lower] court's decision."). The circuit court's denial of waiver in this case was erroneous and must be reversed.

¶57 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring).* The circuit court below determined that waiver into adult court was not warranted. As the majority opinion correctly concludes, there was no reasonable basis for the circuit court to deny the State's waiver petition in this case. Majority op., ¶56; see also J.A.L. v. State, 162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991). Therefore, the circuit court erroneously exercised its discretion, and the circuit court's decision to deny waiver must be reversed. I write separately because there is a second reason why the circuit court's decision must be reversed: the circuit court failed to provide sufficient reasoning to support its decision.

¶58 A circuit court erroneously exercises it discretion when "if it fails to carefully delineate the relevant facts or reasons motivating its decision."[1] State v. Tyler T., 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192; McCleary v. State, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971) ("[T]he failure to exercise discretion (discretion that is apparent from the

---

[1] "Regardless of the extent of the trial court's reasoning, a reviewing court will uphold a discretionary decision if there are facts in the record which would support the trial court's decision had it fully exercised its discretion." State v. Hurley, 2015 WI 35, ¶29, 361 Wis. 2d 529, 861 N.W.2d 174 (quotations omitted); accord McCleary v. State, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971). We cannot reverse a valid juvenile waiver decision simply due to the circuit court's failure to articulate reasoning without providing the opportunity for a rehearing. See Paschong v. Hollenbeck, 16 Wis. 2d 284, 286, 114 N.W.2d 438 (1962) (explaining that appellate courts "remand to the trial court to exercise discretion" when "there [is] room in the facts which did not confine the court to one result").

record) when discretion is required, constitutes an [erroneous exercise] of discretion.").

¶59 The statute governing juvenile waivers into adult court adds support and clarification to this standard. Wisconsin Stat. § 938.18(4)(b) states that circuit courts "shall base [their] decision[s] whether to waive jurisdiction on the [five] criteria" specified in § 938.18(5). Section 938.18(5) reiterates this requirement: "If prosecutive merit is found, the court shall base its decision whether to waive jurisdiction on the [five] criteria." Finally, § 938.18(6) explains that, "[a]fter considering the criteria under sub. (5), the court shall state its finding with respect to the criteria on the record." The plain text of § 938.18 indicates that circuit courts must consider, address, and analyze each of the five criteria used in juvenile waiver proceedings before making a waiver determination. § 938.18(5). Of course, the weight and importance of some criteria may differ depending on the case. "The juvenile court has discretion as to the weight it affords each of the criteria." J.A.L., 162 Wis. 2d at 960. There may be some cases, for instance, in which the seriousness of the offense alone justifies wavier into adult court. See B.B. v. State, 166 Wis. 2d 202, 209, 479 N.W.2d 205 (Ct. App. 1991) (affirming as a reasonable exercise of discretion a circuit court decision to waive a juvenile charged with five counts of first-degree intentional homicide into adult court when all criteria favored retaining jurisdiction, except the seriousness of the offense). Nonetheless, no matter how the circuit court

2

decides the criteria are best weighed, it must still evaluate each of the five statutory criteria and state its findings on the record. Tyler T., 341 Wis. 2d 1, ¶24; § 938.18(4)(b), (5), (6).

¶60 While the circuit court in this case discussed much of the record at the waiver hearing and cited the statutory criteria, it failed to perform that final, invaluable step of proper judicial reasoning: analyzing and applying the facts to the relevant criteria. The circuit court stated in broad and generalized terms that it had received evidence on different topics. It stated, "we have talked and I heard a lot of testimony about school and how schooling was a major issue"; "we all know that connection between education and risk of offending"; "[the HSW] did talk about . . . [her] frequent contact with [X.S.], trying to identify how she could help him"; a YASI risk assessment finding X.S. a high risk to reoffend "really highlighted . . . history, school, and family"; "[w]e heard from Dr. Thompson" who "went through his assessment."

¶61 The circuit court then turned to the statutory criteria. It stated, "we talked about some of [X.S.'s] personality traits" and his "family life"; "[w]e also talked about his age and maturity level"; "[X.S.'s] continued association with [E.G.] . . . came out when we discussed the nature of this offense that we're discussing"; "we can talk about [maturity] in a number of ways"; "[p]attern of living, so we talked about that." For prior history, the circuit court stated "we talked and I heard . . . [X.S] has been on

3

supervision"; "[X.S.] didn't comply with Running Rebels or his GAIN assessment"; and X.S.'s prior delinquency "came in with two charges" and "we talked in detail about that prior case." For the seriousness of the offense, the circuit court stated that "we spent a lot of time on this criteria"; "the allegations are incredibly serious"; and the record "shed[s] some light on our discussion about whether the act was premeditated." For the adequacy of the juvenile system, the circuit court stated "we have . . . a history of really declining and not engaging in several treatment options"; "legal history, school, and family . . . are the risk factors we're talking about"; and "I didn't hear any testimony on a timeline that [X.S.] would need for treatment."

¶62 Finally, the circuit court explained that "much of the conversation focused on the nature of the offense . . . and the adequacy of the system." It stated that it has "no information to . . . find that the juvenile system is inadequate" and "[w]e handle serious cases all the time in juvenile court." The circuit court appeared to conclude that the "adequacy and suitability" of juvenile facilities weighed against waiver; the circuit court explained that the seriousness of the offense "does not bar" juvenile proceedings.

¶63 The lack of analysis provided in the circuit court's transcript is striking. The circuit court repeatedly stated in general terms that it and the parties, i.e., "we," heard evidence from different perspectives. The transcript leaves the reader anxiously awaiting how the circuit court will weigh those

4

facts and apply them to the statutory criteria. Alas, the reader is ultimately left disappointed, learning only after the fact that the circuit court had "already discussed" those issues, unbeknownst to any reasonable observer. Contrary to the circuit court's statements, it never actually provided analysis. It never individualized the statutory criteria to the facts of this case, and it never fully articulated how it came to its decision.

¶64 The circuit court reiterated the substantial body of evidence that favored waiver, including X.S.'s abysmal treatment history, his prior conduct, the serious issues with X.S.'s family support, and the extreme and violent nature of his crimes. None of these facts, at the center of a proper waiver analysis in this case, were weighed or properly balanced against any offsetting considerations. They were simply cited, along with the statutory criteria. The circuit court then declared they "were discussed." Similarly, the circuit court cited the HSW's and Dr. Thompson's opinions in opposition to waiver. But the court never fully explained how much, if any, weight it was giving to those opinions and whether and to what extent the opinions were credible, given the information relied upon by the HSW and Dr. Thompson in the formation of their opinions. The circuit court did not compare the HSW's final opinion to the body of evidence the circuit court cited and the HSW herself produced, which included a YASI risk assessment indicating a high likelihood of recidivism, serial violations of the prior juvenile disposition order, minimal respect for court-ordered

5

conditions, and little receptiveness to outreach and treatment. The circuit court did not discuss the shocking discrepancy between the established record and Dr. Thompson's findings that X.S. was compliant with court orders, had a positive attitude toward state authority, and had a strong network to support law-abiding behaviors.

¶65 From reading the circuit court transcript, we cannot readily determine whether the circuit court believed "[t]he personality of the juvenile," "[t]he prior record of the juvenile," or the "type and seriousness of the offense" weighed in favor or against waiver. Wis. Stat. § 938.18(5)(a), (am), (b). And if we cannot, we seriously doubt others, especially the lay public, can. While the circuit court appeared to conclude that the "adequacy and suitability" of the juvenile system did not support waiver, that is only one criteria. § 938.18(5)(c). The circuit court provided no material analysis as to how that one criteria compared, interacted, and countered considerations of other factors. No substantive discussion was provided as to how all the factors, considered and weighed together as a whole, supported denial of the State's waiver petition.

¶66 More is required to ensure a proper exercise of discretion. See McCleary v. State, 49 Wis. 2d at 268-70 (describing how a sentencing court read from evidence, concluded it agreed with the evidence without further analysis or explanation, and provided cursory findings on the seriousness of the offense and the defendant's motives; reasoning that the

6

Wisconsin Supreme Court could not infer whether the sentencing court had applied the applicable sentencing factors, thus resulting in an erroneous exercise of discretion); Hartung v. Hartung, 102 Wis. 2d 58, 67, 306 N.W.2d 16 (1981) (explaining in the context of circuit court rationale for a alimony and child support order that "[i]t is not enough that the relevant factors upon which discretion could have been based may be found obscurely in the record"); State v. Hall, 2002 WI App 108, ¶¶16-17, 255 Wis. 2d 662, 648 N.W.2d 41 (explaining that the circuit court indicated it "[took] into consideration" evidence and "mentioned a number of the sentencing factors," which reflected "decision-making" but not a "process of reasoning based on a logical rationale," in an erroneous exercise of discretion (quotations omitted)).

¶67 Circuit courts have the responsibility to "carefully delineate the relevant facts [and] reasons motivating its decision." Tyler T., 341 Wis. 2d 1, ¶24. They are statutorily obligated to "state [their] finding[s] with respect to the criteria on the record." Wis. Stat. § 938.18(6). This ensures clear and well reasoned decisions for the benefit of the public, appellate courts, and the individuals subject to waiver proceedings. Here, the circuit court failed to provide adequate reasoning for its decision, and that was an erroneous exercise of discretion.

¶68 As the majority opinion correctly concludes, there was no reasonable basis for the circuit court to deny the State's waiver petition in this case. Majority op., ¶56; see also

7

J.A.L., 162 Wis. 2d at 961. However, there is a second reason why the circuit court's decision must be reversed: the circuit court failed to provide adequate reasoning as required under the law.

¶69 For the foregoing reasons, I respectfully concur.

¶70 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and REBECCA GRASSL BRADLEY join this concurrence.

¶71 BRIAN HAGEDORN, J. *(dissenting).* In the face of a deeply disturbing crime, the State sought to waive a juvenile offender out of the jurisdiction of the juvenile court and into adult court. The circuit court denied the State's request. Although another judge might have reasonably reached a different conclusion on the same set of facts, this decision was within the discretion the law affords to circuit court judges. The majority, however, displaces the circuit court's discretion with its own, even as it pays lip service to the deferential standard of review we are duty-bound to apply. After reviewing cold transcripts of testimony the circuit court heard firsthand, the majority concludes it knows better and grants the State's waiver petition——a remedy even the State didn't think to ask for. The majority errs.

¶72 The majority's essential misstep is that it brushes aside the circuit court's decision and conducts the analysis afresh——both in finding its own facts and deciding the issue without the proper deference to the circuit court. To be sure, the circuit court's analysis left something to be desired in both content and clarity. But that should not doom its determination. Read reasonably and in context, the transcript reveals that the circuit court examined the relevant facts, applied the proper standard of law, and rationally connected the facts to the law. See Lane v. Sharp Packaging Sys., Inc., 2002 WI 28, ¶19, 251 Wis. 2d 68, 640 N.W.2d 788. Given this standard of review, the law instructs that the ultimate judgment call is the circuit court's to make, even for decisions we dislike. The

1

majority acknowledges this rule, and then promptly ignores it. Because the law entrusts these judgment calls to locally elected circuit court judges, and not to us, I respectfully dissent.

## I.  BACKGROUND

¶73 This case began when the State filed a delinquency petition against Xander (a pseudonym), alleging eight counts of first-degree reckless injury with the use of a dangerous weapon and a single count of possession of a dangerous weapon. The charges stemmed from a shooting that occurred at Mayfair Mall in Wauwatosa; eight people were senselessly injured. Xander, the alleged shooter, was 15 at the time.

¶74 The day after the delinquency petition was filed, the State petitioned for waiver of jurisdiction into adult court. At the waiver hearing, the State presented only one witness, an employee of the Milwaukee County Division of Youth and Family Services (DYFS) who recommended against waiving Xander into adult court. Xander called his own expert witness, Dr. Thompson, who, like the State's witness, testified against waiver. He opined that Xander could be effectively treated in the juvenile system. No witness called by either the State or Xander testified in favor of the waiver petition. After hearing testimony from both witnesses and argument from the attorneys, the circuit court denied the State's petition for waiver, providing a lengthy explanation from the bench for its reasoning.

2

¶75 The State sought leave to appeal the waiver denial, which the court of appeals granted. The court of appeals reversed and remanded with directions to conduct a new waiver hearing. State v. X.S., No. 2021AP419, unpublished slip op. (July 20, 2021). Xander moved for reconsideration, which the court of appeals summarily denied.[1] We granted Xander's petition for review.

## II. DISCUSSION

¶76 This case centers on the relevant legal standards for waiver of a juvenile into adult court under Wis. Stat. § 938.18. Under the system the legislature has designed, not all criminal conduct is treated the same. In particular, the legislature established a justice system for juveniles aiming to "impose accountability for violations of law and equip juvenile offenders with competencies to live responsibly and productively." Wis. Stat. § 938.01(2); see also State v. Toliver, 2014 WI 85, ¶26, 356 Wis. 2d 642, 851 N.W.2d 251. Juvenile courts have "exclusive jurisdiction . . . over any juvenile 10 years of age or older who is alleged to be delinquent." Wis. Stat. § 938.12(1). Rather than impose criminal penalties, juvenile courts may impose a variety of dispositions on juveniles to protect the public and hold

---

[1] Xander and the State both argue this summary denial was erroneous. The court of appeals did not erroneously exercise its discretion; nothing in Wis. Stat. § (Rule) 809.24(2) requires the court of appeals to explain its rationale for denying a party's reconsideration motion. See also State v. Jendusa, 2021 WI 24, ¶21, 396 Wis. 2d 34, 955 N.W.2d 777.

3

offenders accountable. Compare Wis. Stat. §§ 973.01, 973.03, 973.09 (criminal penalties) with Wis. Stat. § 938.34 (juvenile dispositions); Wis. Stat. § 938.01(2) (purposes of Wis. Stat. ch. 938). They also work with service providers, such as DYFS to provide treatment and care that will redirect juveniles away from further delinquent behavior. § 938.01(2). However, a court may waive jurisdiction over a juvenile and transfer jurisdiction to adult criminal court via statutory procedures outlined in § 938.18.

¶77 Waiver under Wis. Stat. § 938.18 is a discretionary decision, reviewed under the highly deferential erroneous exercise of discretion standard. State v. Tyler T., 2012 WI 52, ¶24, 341 Wis. 2d 1, 814 N.W.2d 192. "A juvenile court erroneously exercises its discretion if it fails to carefully delineate the relevant facts or reasons motivating its decision or if it renders a decision not reasonably supported by the facts of record." Id. On review, appellate courts affirm the wavier determination if the record reflects "a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination." J.A.L. v. State, 162 Wis. 2d 940, 961, 471 N.W.2d 493 (1991). Unless they are clearly in error, we accept the circuit court's findings of fact. State v. Van Linn, 2022 WI 16, ¶10, 401 Wis. 2d 1, 971 N.W.2d 478. And while circuit courts are given the authority to make reasonable decisions based on the facts and law, a decision based on a misapplication of the law must be reversed. State v.

4

Patrick G.B., 2001 WI App 85, ¶12, 242 Wis. 2d 550, 627 N.W.2d 898.

### A. Waiver Hearings Under Wis. Stat. § 938.18

¶78 A petition waiving jurisdiction of the juvenile court may be filed if the "juvenile is alleged to have violated any state criminal law on or after the juvenile's 15th birthday." Wis. Stat. § 938.18(1)(c). This petition "may be filed by the district attorney or the juvenile or may be initiated by the court," and it "shall contain a brief statement of the facts supporting the request for waiver." § 938.18(2). The petition "shall be accompanied by or filed after the filing of a petition alleging delinquency and shall be filed prior to the plea hearing"──subject to certain exceptions. Id.

¶79 The waiver hearing that follows is a two-step process. First, the court must determine "whether the matter has prosecutive merit." Wis. Stat. § 938.18(4)(a). While not defined in Wis. Stat. § 938.18, this court previously noted "that the determination of 'prosecutive merit' is analogous to the determination of probable cause in a criminal proceeding and that a finding of prosecutive merit must be based on a showing that reasonable grounds exist to believe that the juvenile has committed the violation of state criminal law charged." T.R.B. v. State, 109 Wis. 2d 179, 187, 325 N.W.2d 329 (1982).

¶80 Once prosecutive merit is established, the circuit court proceeds to decide, in its discretion, whether it should waive jurisdiction. Wis. Stat. § 938.18(4)(a). This decision

must be based on five criteria articulated in § 938.18(5), all of which are explored in depth below. After consideration of § 938.18(5)'s criteria,

> the court shall state its finding with respect to the criteria on the record, and, if the court determines on the record that there is clear and convincing evidence that it is contrary to the best interests of the juvenile or of the public to hear the case, the court shall enter an order waiving jurisdiction and referring the matter to the district attorney for appropriate proceedings in the court of criminal jurisdiction.

§ 938.18(6). Thus, a circuit court's duty is to state its findings on the record. Then it must determine whether the State met its burden to prove by clear and convincing evidence that waiver is appropriate because it is in the best interests of the juvenile or the public.

### B. The Circuit Court's Discretionary Decision

¶81 Here, the circuit court determined there was prosecutive merit, which Xander did not contest. The dispute therefore centers entirely on whether the circuit court permissibly exercised its discretion when it denied the State's petition to waive Xander into adult court.

¶82 The circuit court heard a full day's worth of testimony, and several hours of argument, before announcing its decision on waiver. Only two witnesses testified: Xander called Dr. Thompson, his expert, and the State presented a DYFS employee. Both testified in support of the juvenile court retaining jurisdiction. To reiterate, the circuit court's choice to deny waiver was based on testimony from two witnesses

6

who testified against waiver and zero witnesses who recommended waiver.

¶83 The court began its decision with a high-level overview of the testimony and identified the correct legal standards: Wis. Stat. § 938.18(5), (6). It then worked through the criteria one by one and discussed the pertinent testimony for each.

¶84 The circuit court started by reading the first criterion under Wis. Stat. § 938.18(5)(a): "The personality of the juvenile, including whether the juvenile has a mental illness or developmental disability, the juvenile's physical and mental maturity, and the juvenile's pattern of living, prior treatment history, and apparent potential for responding to future treatment." It then summarized the testimony and argument it had heard with respect to this factor over the course of two days. Specifically, it noted Dr. Thompson's diagnosis of Xander; that Xander's mental and physical maturity seemed consistent with his age; Xander's home life and his association with another individual allegedly present at the shooting and involved in his first juvenile adjudication; and Xander's past treatment history, noting that Xander was under supervision when the allegations at issue in the present petition surfaced. Finally, the court indicated that it received differing opinions on Xander's potential for responding to future treatment——a subject it also addressed at the end of its decision. In identifying the relevant and uncontested testimony pertinent to this criterion, the only reasonable

7

reading of the transcript is that the circuit court did exactly as the statute requires: "state its finding with respect to the criteria on the record." § 938.18(6).

¶85 The circuit court next looked to the second criterion:

> The prior record of the juvenile, including whether the court has previously waived its jurisdiction over the juvenile, whether the juvenile has been previously convicted following a waiver of the court's jurisdiction or has been previously found delinquent, whether such conviction or delinquency involved the infliction of serious bodily injury, the juvenile's motives and attitudes, and the juvenile's prior offenses.

Wis. Stat. § 938.18(5)(am). The circuit court noted Xander's prior juvenile delinquency and that Xander had no prior adult convictions. It stated that the prior delinquency did not involve the infliction of serious bodily injury. Again, this cannot help but be understood as factual findings regarding Xander's prior record.

¶86 The third criterion requires consideration of the "type and seriousness of the offense, including whether it was against persons or property and the extent to which it was committed in a violent, aggressive, premeditated or willful manner." Wis. Stat. § 938.18(5)(b). The circuit court unequivocally addressed this head on. It explained that "there's no dispute that this was an incredibly dangerous, serious, series of events. These allegations are incredibly serious." The court largely adopted the district attorney's summation of the allegations made previously in the hearing, adding that some information, particularly regarding Xander's mental state, might be speculative. Notably, the circuit court

8

acknowledged that these alleged events occurred in a public place where more people could have died or been injured——once more underscoring the serious nature of these offenses. Finally, the circuit court mentioned that both the State and the defense discussed the seemingly impulsive nature of the alleged crime. A review of the transcript thus reveals that the circuit court took care to incorporate the frightening details of the charges against Xander into its consideration; it did not ignore or minimize the seriousness of the allegations.

¶87 The circuit court then turned to the fourth criterion:

> The adequacy and suitability of facilities, services and procedures available for treatment of the juvenile and protection of the public within the juvenile justice system, and, where applicable, the mental health system and the suitability of the juvenile for placement in the serious juvenile offender program under s. 938.538 or the adult intensive sanctions program under s. 301.048.

Wis. Stat. § 938.18(5)(c). When analyzing this criterion, the circuit court identified what evidence it had heard, and what it had not. The circuit court took note that because of Xander's age, he could be placed at Lincoln Hills, the juvenile correction facility, for only "six to nine months." The court acknowledged the State's view that a six-to-nine month window was too short to address Xander's risk factors. But the circuit court did not adopt that view. Instead, it concluded that because there was no evidence in the record regarding how long Xander might need for treatment, it could not find that the time remaining was insufficient. The circuit court's approach is consistent with the legal requirement that it is the State's

burden to prove its case by clear and convincing evidence. See § 939.18(4)(b), (6). The circuit court also acknowledged this was not Xander's first delinquency, but it explained that the juvenile system could address and work to change Xander's behavior and school attendance. All told, the circuit court made a series of factual findings regarding the fourth criterion based on the testimony it heard.

¶88 Finally, the circuit court addressed the fifth criterion: "The desirability of trial and disposition of the entire offense in one court if the juvenile was allegedly associated in the offense with persons who will be charged with a crime in the court of criminal jurisdiction." Wis. Stat. § 938.18(5)(d). The circuit court correctly stated this criterion was not applicable.

¶89 After finishing this review and identification of relevant evidence for each of the five criteria under Wis. Stat. § 938.18(5), the circuit court turned to the main question before it, supplementing its determination with additional references to the evidence it had heard. We quote this portion of its decision in full:

> But a major part of our focus is on this -- this nature of this offense and the time that we have left in the juvenile system.
>
> You know, I've said this before as well, this Court relies on – I'm not the one that gets to do the assessments. I'm not the one that gets to do the treatment plan. I'm not the one that gets to -- I'm not the expert. I'm not a psychologist.
>
> I rely on the experts in the fields to tell me what information is appropriate in order to both keep our youth safe and rehabilitate them and to some -- and to

10

an extent keep the public safe, right? And they know that usually the State is the person saying that they represent the public and community safety but that's a part of my job too, as well. So that's what I rely on. I'm relying on the information provided by DYFS at least to give me some context on what was going on at the time of this offense. I'm considering the fact that when we talk about the adequacy of this system I have no information to opine or find that the juvenile system is inadequate to meet [Xander's] needs. I don't have information that -- I would -- I would have to accept the State's argument that jurisdiction until he is 18 is inadequate, but again I don't have information that supports that -- that assertion.

I'd have to find that without any sort of expert testimony or psychologist saying, "Hey, based on these treatment needs and this plan this is not going to work". I don't have that. We handle serious cases all the time in juvenile court. So the offense being serious, this offense, because this is an individual assessment, does not bar or indicate that this Court that this system would be inadequate on its face.

I've been given a diagnosis with a treatment plan. That is not uncommon for treatment plans that we give other youth, in other cases, who are similarly situated. I don't have information that would lead me to find -- that could support a finding that this system is inadequate, particularly given that there are a number of treatment options and secure settings that have not been utilized.

And aside from that, I know, that there -- based on the evidence based tool that we use to assess risk factors and protective factors. That there are factors within [Xander's] risk -- I should say or within his assessment -- that can be addressed. I have no information that would lead me to find that DYFS and the juvenile system as a whole cannot address these risk factors, cannot address the treatment needs that were identified, and cannot do those things while both keeping [Xander] safe and the public safe.

Back to that standard that I mentioned before, the Court would be required to find that the State has proven by clear and convincing evidence that it is contrary to the best interests of the juvenile or of the public to hear the case. I don't find that it's

11

contrary to [Xander's] best interests, based on the information that I just provided, regarding the risk factors, the potential treatment, and the services that are available to him in the juvenile justice system.

I don't have information that would support a finding that the remainder of the time that this Court would have left is insufficient. I'm not finding that it would be in the public's -- that it would be contrary of the public's best interest either.

We do have an ability to both keep the public safe and keep [Xander] in a structured setting, which I think it's apparent is what he needs, based on what I've heard from the prior -- how his supervision was going on his underlying case on his older pending case, while this was occurring. And for those reasons I am going to deny the State's petition for waiver.

¶90 To summarize the foregoing, the circuit court reiterated several of its key findings on the various criteria under Wis. Stat. § 938.18(5). The court expressed its reliance on the information provided by the two witnesses when considering if the juvenile system was adequate to address Xander's needs——emphasizing that the record did not support the State's assertion that jurisdiction until Xander is eighteen was inadequate. It noted that the juvenile court had the ability to handle serious cases. And the circuit court stated its conclusion that the juvenile system could address Xander's treatment needs while keeping the public and Xander safe. The circuit court then centered on the proper legal framework: the State had to prove by clear and convincing evidence that retaining jurisdiction in juvenile court is contrary to Xander's and the public's best interest. The State did not do so, the court held, once more citing the treatment and services available to Xander in the juvenile justice system, and its

12

conclusion that the State had not proven this was contrary to the public's best interests.

¶91 The circuit court's decision in this case was reasonable and within its broad discretion. It identified the correct legal standard, Wis. Stat. § 938.18(5), (6), and noted the relevant facts with respect to each of the criteria under § 938.18(5). Then, the court rationally applied the facts to the law to reach its decision——explaining its conclusion that retaining jurisdiction was in the best interest of Xander and the public. Could the circuit court have more clearly articulated its factual findings and legal conclusions? Sure. However, when we review discretionary decisions, we do not require a perfectly polished transcript or magic words. Rather we "look for reasons to sustain the trial court's discretionary decision," reversing "if and only if the record does not reflect a reasonable basis for the determination or a statement of the relevant facts or reasons motivating the determination is not carefully delineated in the record." J.A.L., 162 Wis. 2d at 961. That simply is not the case here.[2]

---

[2] The State also argues that the circuit court committed a legal error by introducing and relying on inadmissible hearsay testimony from Dr. Thompson. The State forfeited this argument. The State never objected to the introduction of this testimony before the circuit court and in fact elicited this testimony from Dr. Thompson during cross-examination. It cannot now seek to invalidate the circuit court's decision on waiver based on testimony it elicited and did not object to.

## C. The Majority

¶92 The majority opinion takes a different tack. It oversteps its role as an appellate court and supplants the circuit court's discretionary decision-making authority with its own. It conducts what amounts to a de novo review, concluding waiver into adult court is required. See Majority op., ¶¶32-55. The majority analyzes the relevant criteria under Wis. Stat. § 938.18(5), not by referencing the circuit court's factual findings and legal conclusions, but by evaluating the record anew——effectively sitting in the place of the circuit court. This is wholly inappropriate in light of our scope of review in these cases.

¶93 The majority also argues that because the "facts of this case are extreme," that lends credence to its conclusion that the circuit court acted in error. Majority op., ¶55. Yes, the facts of this case are extreme. Eight people suffered dangerous gunshot injuries resulting from the actions for which Xander was charged. But facts——extreme or not——do not change the legal standard that we are called to apply as an appellate court. The majority's reasoning seems to be that any juvenile committing a serious crime should be waived into adult court. This is contrary to legislature's policy choice reflected in the juvenile justice code; it is not what Wis. Stat. § 938.18 requires or allows. Here, the circuit court acknowledged the severity of Xander's actions, along with the other relevant criteria it must consider under Wis. Stat. § 938.18(5) and (6). Because this is precisely the type of discretionary decision

14

entrusted to locally elected circuit court judges who hear these matters day-in and day-out, we cannot now reverse such a decision simply because we feel strongly that the court should have concluded otherwise.

¶94 Finally, the majority errs by declining to order a new waiver hearing upon the finding of error. Majority op., ¶¶3, 56. The State did not ask for such relief; it asked us to remand for a new waiver hearing. Additionally, as already explained, a decision to waive jurisdiction of a juvenile court requires a court to make factual findings and legal determinations under Wis. Stat. § 938.18. Appellate courts are not equipped or authorized in the ordinary course to make factual findings. Douglas L. v. Arika B., 2015 WI App 80, ¶18, 365 Wis. 2d 275, 872 N.W.2d 357. And we are ill-suited to make credibility determinations regarding the testimony the circuit court witnessed in its courtroom. Given the majority's conclusions, the better course would be to award the State the relief it asked for and remand for a new waiver hearing.

## III. CONCLUSION

¶95 All told, the majority confronts a discretionary decision it thinks was wrong, and burns through the law in an effort to override it. Applying the proper standard of review as we must, the circuit court did not erroneously exercise its discretion in denying the State's petition for waiver. I respectfully dissent.

15

¶96  I  am  authorized  to  state  that  Justices  ANN  WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.