COURT OF APPEALS
DECISION
DATED AND FILED

October 10, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. 2023AP1288
2023AP1289
2023AP1290
2023AP1291
2023AP1292
STATE OF WISCONSIN

Cir. Ct. Nos. 2020TP106
2020TP107
2020TP108
2020TP109
2020TP110

IN COURT OF APPEALS
DISTRICT I

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.J., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

  V.

S.A.,

       RESPONDENT-APPELLANT.

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.A., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

  V.

**S.A.,**

       **RESPONDENT-APPELLANT.**

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.J., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**S.A.,**

       **RESPONDENT-APPELLANT.**

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.A., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**S.A.,**

       **RESPONDENT-APPELLANT.**

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO T.J., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

---

2

**v.**

**S.A.,**

      **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed.*

¶1    GEENEN, J.[1] Sherry appeals the orders of the circuit court terminating her parental rights to Terri, Tisha, Troy, Tina, and Todd.[2] Sherry argues that the court erroneously exercised its discretion when it determined that it was in the best interest of the children to terminate Sherry's parental rights and asserts that there was insufficient evidence in the record for the court's conclusions. Upon review, we affirm.

## BACKGROUND

¶2    On October 6, 2017, the Division of Milwaukee Child Protective Services ("DMCPS") received a referral that Sherry, twenty-five weeks pregnant with her fifth child, Todd, was in the hospital complaining of abdominal pain. During her appointment, she disclosed that she felt unsafe at home with the father of her children, T.J., because of how aggressive he was at home. T.J. was

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] For ease of reading and to protect the confidentiality of these proceedings, we use pseudonyms to refer to the parties in this case.

observed in the waiting room yelling at their four children—the oldest of whom was five years old—pulling them up by their limbs, grabbing their hair, and spanking them. The police were contacted, and T.J. was arrested for disorderly conduct.

¶3    DMCPS went to the home to investigate the referral and discovered a pattern of abuse between T.J. and Sherry that the children routinely witnessed in the home. DMCPS also learned that Indiana Child Protective Services (CPS) substantiated allegations that T.J. sexually abused Terri. Due to ongoing domestic violence and the potential for the family fleeing the state, Terri, Tisha, Troy, and Tina were placed in out-of-home care.

¶4    On December 31, 2017, DMCPS received a referral that Sherry had given birth to Todd in her home. The fire department was dispatched to the home but were denied access to the child; T.J. had earlier fled with Todd to Illinois where Todd was immediately hospitalized over concerns of hypothermia and breathing difficulties. Sherry and T.J. were subsequently taken into custody and charged with child neglect. On January 2, 2018, Todd was placed in out-of-home care upon being discharged from the hospital; he has never lived with Sherry. A CHIPS dispositional order was entered on March 20, 2018, regarding all five children; they were placed in out-of-home care, where they have remained throughout the duration of the CHIPS case.

¶5    On June 4, 2020, the State filed petitions to terminate Sherry's and T.J.'s parental rights to the five children. The TPR petitions alleged that grounds existed to terminate Sherry's parental rights because she failed to assume parental

4

responsibility under WIS. STAT. § 48.415(6) and because the children remained in need of protection or services under § 48.415(2).

¶6    On August 31, 2020, an initial appearance on the TPR petitions was held. Sherry failed to appear at multiple subsequent hearings after having been ordered to personally appear, and the circuit court defaulted her as to grounds for termination. On November 28, 2022, after an evidentiary hearing as to grounds, the court found that the allegations in the petitions had been proven and that Sherry was unfit under WIS. STAT. § 48.424(4).[3]

¶7    The dispositional hearing was held on November 28, 2022, December 1, 2022, and February 17, 2023. The circuit court heard testimony from witnesses including the children's foster parents and case managers and caseworkers, other care providers, and Sherry.

¶8    Jane Doe Number 1 ("Doe 1") is Troy's current foster placement, and her testimony included the following: Troy was seven years old at the time of placement with Doe 1 on December 30, 2021. Troy calls her "mommy" and seeks her out for his comfort and needs. Troy has a relationship with her extended family and gets along well with her other children. Troy has several medical diagnoses for which he receives treatment, including autism and oppositional defiant disorder, and Doe 1 would continue to take Troy to all of his services.

---

[3] Termination of parental rights is governed by the Wisconsin Children's Code. The first step is a fact-finding hearing to determine whether the grounds exist to terminate parental rights exist. *See* WIS. STAT. §§ 48.415, 48.424. A circuit court may enter default as to grounds for failing to comply with a court order to personally appear, but only after it takes sufficient evidence to prove by the clear and convincing standard of proof that grounds for the termination exist. *See* **Oneida Cnty. DSS v. Nicole W.**, 2007 WI 30, ¶26, 299 Wis. 2d 637, 728 N.W.2d 652.

5

Doe 1 believes she is very qualified to meet Troy's medical needs based on her work history at Mendota Mental Health Institution and in the health service unit for a correctional facility. Doe 1 is an adoptive resource for Troy, and if allowed to adopt him, Doe 1 would maintain contact between Troy and his siblings. Troy does not ask Doe 1 to see Sherry, and she believes visiting Sherry triggers Troy's aggressiveness based on his behavior after visits with Sherry.

¶9 Jane Doe Number 2 ("Doe 2") is Tina's and Todd's current foster placement, and her testimony included the following: Tina and Todd have been placed in her home for four years, since they were two and one-half years old and ten months old, respectively. Tina and Todd call Doe 2 "mom" and her husband "papa," and seek her out for their comfort and needs. Tina and Todd have a relationship with Doe 2's extended family and get along well with her other children. Doe 2 is an adoptive resource for Tina and Todd, and while she is aware that they have separation anxiety, she remained committed to adopting Tina and Todd. If allowed to adopt Tina and Todd, Doe 2 would maintain contact between them and their siblings. Doe 2 also observed that Todd's visits with Sherry left him confused, and he told her he did not want to go to visits with Sherry anymore.

¶10 Jane Doe Number 3 ("Doe 3") is Terri's current foster placement, and her testimony included the following: Terri had been placed in her home since March 16, 2020, when she was eight years old. Terri calls Doe 3 "mom" and her husband "dad," and seeks Doe 3 out for her comfort and needs. Doe 3 is an adoptive resource for Terri and is committed to adopting her, and Terri was excited about and wanted to be adopted. Terri has a relationship with Doe 3's extended family, including two of Doe 3's nieces and nephews who Terri refers to

6

as her cousins. Although Terri was extremely physically aggressive during the first six months of the placement, after working with her, Terri has minimal behavioral issues. Terri has not visited with Sherry for at least the duration of her placement with Doe 3, but had two phone calls with Sherry in the fall of 2022. Terri has not expressed a desire to contact her siblings, but if she did, Doe 3 would arrange that contact.

¶11    M.M., the children's ongoing case manager, testified at length about the children's history in foster care, their medical and other needs, their relationships, and what she has observed and been told by and about the children in light of her role. M.M.'s testimony included observations that each child is doing well in their current placement and that, though each of the children has varying medical needs, each child's respective caregivers are aware of and meeting the children's needs. She noted that each child has formed bonds with their respective foster parents and, in most cases, the foster parents' extended families, and that Terri, Troy, Tina, and Todd were placed with adoptive resources and their respective foster parents are committed to adopting them, but that, if for some reason they are not adopted by their current foster parents, they are still adoptable children. M.M. also explained that, while Tisha is not placed with an adoptive resource, she is an adoptable child that gets along with people very well and has no health or age barriers to adoption.

¶12    M.M. testified that in the five years since the children were removed from the home, Sherry has not progressed beyond one weekly four-hour supervised visit. She stated that none of the children appeared to have bonds with any of their extended biological family and told the court about DMCPS's

7

unsuccessful efforts to place the children with extended family members. M.M. also explained that the only child who appeared to have a significant emotional bond with Sherry is Tisha, based on Tisha mentioning on a couple of occasions that she would like to go back and live with Sherry

¶13    M.M. also testified that she did not believe that any of the children would be harmed if their legal relationship with Sherry were severed. According to M.M., Terri repeatedly told M.M., her foster parents, and her treatment foster care worker that she wanted to be adopted by her current foster parents and discussed adoption with her therapist; Tisha has stated that she does not want to be adopted but would like to stay with her current foster parents; and that, while Troy, Tina, and Todd are not old enough to understand adoption, Troy stated he would like to stay with his current placement. M.M. also testified that Tina and Todd have told their foster parents that they do not want to go on another visit with Sherry and that none of the children, except Tisha, have expressed any desire to return to Sherry's home within the last year.

¶14    M.M. further told the court that if it did not grant the TPR petitions, the children would likely remain in foster care because Sherry has not made significant behavioral changes, still struggles to understand the children's mental health needs, and has not completed all court-ordered services. M.M. also told the court that, on multiple occasions, Sherry denied that the children have mental health diagnoses or special medical needs and has refused treatment and

8

medication adjustments recommended by the children's medical providers.[4]  M.M. stated that, if the court were to grant the TPR petitions, the children would enter into more stable and permanent family relationships because the children are bonded with their foster parents and their needs are being met.

¶15    M.M. was also asked about the report that DMCPS filed with the court under WIS. STAT. § 48.425.  M.M. testified that she reviewed the report, believed it to be true and accurate, and that it supported M.M.'s testimony.  The report recommended that the court grant the TPR petitions.

¶16    Sherry also testified.  She told the court that she was living in a two bedroom apartment and planned to continue living there if her five children were returned to her, unless she moved into a three bedroom apartment owned by her current landlord.  Sherry worked at a restaurant and as a delivery driver, though she did not say where.  Sherry claimed that she participated in parenting classes but could not say when or where.  Sherry said that she engaged in individual therapy on and off, but could not remember the last time she went.  When asked if she was receiving any services currently, she replied that she was "doing a lot right now" but would not specify because "[i]t's private."

¶17    Sherry testified about her visits with the children.  She noted that she cooked for the children during some visits and brought them activities and hygiene items.  According to Sherry, the children were always happy to see her and they

---

[4] E.B., another of the children's case managers, also testified regarding Sherry's relationship with her children.  E.B. testified that Sherry declined a medical provider's recommendation for Troy for a device that is helpful for children with autism because, Sherry claimed, Troy "[did] not have anything like that."

were inseparable during her visits. She said that the children called her "mommy" and would scream, cry, and hold onto her when it was time to leave.

¶18 During the hearing, Sherry was also asked about her children's needs. She testified that Terri's special needs were "me" (i.e., Sherry). She did not know if Tisha was in therapy and said that Tisha's special needs were that she gets angry. Sherry claimed that Troy's special needs were that "his little organs shake" due to the medication he was receiving and she did not know whether Troy was in therapy.

¶19 After the close of testimony, the circuit court noted that it was considering the report filed by DMCPS and listed the factors that it was required to consider under WIS. STAT. § 48.426(1)-(3), to determine what disposition was in each child's best interest. The court concluded that, while Sherry was doing better, she was not able to demonstrate behavior changes necessary to have her children safely returned to her care or her home, and repeatedly expressed concern about the children languishing in foster care. The circuit court proceeded to consider each of the statutory criteria at § 48.426 for each child, individually. For each child and on the evidence specific to each child, the court evaluated the factors.

¶20 With respect to Terri, Troy, Tina and Todd, the court found that there was a strong likelihood of adoption after termination by their current caregivers. Noting the age and health of each child, the court found that, whether adopted by their current caregivers or not, there were no barriers to adoption if Sherry's parental rights were terminated. It noted Terri did not visit with Sherry and wanted to be adopted by her current caregivers, and that Troy, Tina, and Todd

were too young to express their wishes on adoption. The court found that the children were all doing well socially and that their various needs were being met by their caregivers, that their strongest bonds were with their current caregivers and the caregivers' families, and that they considered their respective caregivers' families to be their own. The court further found that Terri, Troy, Tina, and Todd did not have substantial relationships with their maternal or paternal family members, and that they did not have substantial relationships with Sherry. The court also observed that the children have been placed out of the home for over five years and that it considered that time substantial, and that each child had multiple prior placements. In light of these facts and the significant time of separation from their parents, the court found for Terri, Troy, Tina, and Todd that severing the children's legal relationship with Sherry would not be harmful, particularly because: (1) she had not made steps toward reunification, (2) allowing the children to languish indefinitely in foster care was not a permanency plan, and (3) the children would be able to enter into more permanent, stable family relationships if Sherry's parental rights were terminated. The court concluded, based both on failed prior placements and the positive conditions of the children's current placements, that the children will be able to enter into a more stable and permanent family relationship as a result of terminating Sherry's parental rights.

¶21 The court considered permanency for Tisha last in light of the fact that she was not placed with an adoptive resource. The court went through each factor and found that Tisha was adoptable and in a home in which her needs were being met. Noting Tisha's age and health, the court found no impediments to adoption. The court observed that Tisha was flourishing, and she considered her

11

foster parent to be her family. It found that, although the foster parent does not intend to adopt Tisha, they will provide a permanent home unless and until an adoptive resource is found. Although there was evidence presented that Tisha had expressed a desire to live with Sherry and that she did not want to be adopted, there was also testimony that Tisha wanted to stay with her current foster parents, and the court highlighted that it did not believe Sherry had made meaningful, necessary steps towards reunification. The court emphasized that languishing in foster care for the possibility of future reunification was not more important than providing Tisha with stability. It noted that Tisha had been placed out of Sherry's home for five years and experienced five different placements during that time. It also noted that, given Sherry's limited visitation time and limited involvement with the children over those five years, there has not been a substantial relationship with Sherry or T.J., or any extended family members, and it would not be harmful to Tisha to sever these relationships. While noting that a non-adoptive other planned permanent living arrangement ("OPPLA") was not a perfect permanency option, the court concluded that Tisha will be able to enter into a more stable and permanent family if the TPR petition were granted and could still be adopted.

¶22 Thus, after considering the evidence in light of the best interest of each child and the statutory factors listed in WIS. STAT. § 48.426, the court determined that it was proven by clear and convincing evidence that it would be in the best interest of all five children if Sherry's parental rights were terminated. On

February 21, 2023, the circuit court entered orders terminating Sherry's parental rights to all five children.[5]  Sherry appeals.

## DISCUSSION

¶23    At the dispositional phase of a TPR proceeding, the circuit court decides whether the evidence supports the termination of parental rights and if the termination is in the best interests of the child.  ***Evelyn C.R. v. Tykila S.***, 2001 WI 110, ¶23, 246 Wis. 2d 1, 629 N.W.2d 768.  The circuit court's analysis is guided by WIS. STAT. § 48.426(1), which provides that "the court shall consider the standard and factors enumerated in this section and any report submitted by an agency under [WIS. STAT. §] 48.425."  Section 48.426(2) sets forth the standard: "The best interests of the child[ren] shall be the prevailing factor considered by the court in determining the disposition" of the children.  Finally, § 48.426(3) requires that, in considering the best interests of the child, the court consider, but not be limited to, the following:

> (a) The likelihood of the child[ren]'s adoption after termination.
>
> (b) The age and health of the child[ren], both at the time of the disposition and, if applicable, at the time the child[ren] [were] removed from the home.
>
> (c) Whether the child[ren] [have] substantial relationships with the parent or other family members, and whether it would be harmful to the child[ren] to sever these relationships.
>
> (d) The wishes of the child[ren].

---

[5] T.J.'s parental rights were also terminated as to all five children.  The orders terminating his parental rights are not part of this appeal.

> (e) The duration of the separation of the parent from the child[ren].
>
> (f) Whether the child[ren] will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child[ren]'s current placement[s], the likelihood of future placements and the results of prior placements.

*Id.* "[T]he record should reflect adequate consideration of and weight to each factor." *State v Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475.

¶24    The circuit court's decision whether to terminate parental rights is discretionary. *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). The circuit court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a demonstrated rational process, reaches a conclusion that a reasonable judge could reach." *Id.* "The exercise of discretion incorporates a process of reasoning and proper explanation." *State v. X.S.*, 2022 WI 49, ¶33, 402 Wis. 2d 481, 976 N.W.2d 425. "Discretion is not synonymous with decision-making," thus, a circuit court fails to exercise discretion when it does not explain or justify its decisions. *McCleary v. State*, 49 Wis. 2d 263, 277-86, 182 N.W.2d 512 (1971). The circuit court's findings will not be set aside unless "clearly erroneous." *Gerald O.*, 203 Wis. 2d at 152-53.

¶25    Sherry argues that there was insufficient evidence to determine that termination of her parental rights was in the children's best interest. Sherry does not contend that the circuit court failed to consider any required factor, but rather that when it weighed the evidence against the factors, it should have weighed more

14

heavily Sherry's recent efforts to continue as a significant factor in the children's lives, her strides in addressing the issues that led to the children's removal, and that she loves her children and wants them returned to her.[6] Sherry therefore argues that the circuit court erroneously exercised its discretion when it found that the termination of parental interests was in the best interest of her children. We disagree.

¶26 As a preliminary matter, Sherry's arguments about her progress toward possible reunification and her love for her children and desire for reunification are not controlling considerations. The circuit court's concern at the dispositional hearing is the *children's* best interest based on the evidence presented, not Sherry's.[7] In its ruling, the court acknowledged these considerations but emphasized that Sherry did not demonstrate behavior changes necessary to have her children safely returned to her care or her home, and it considered this factor and the corresponding consequence—leaving the children to languish in foster care indefinitely—in its analysis of the best interest of the children.

---

[6] Sherry also suggests that the court should have considered placement with her sister, Q.R. As a preliminary matter, Q.R. could not be approved as a possible placement through DMCPS because her husband is serving a prison sentence for sex trafficking. Q.R. testified during the dispositional hearing that she intends to remain married to her husband. Nevertheless, the court considered a family-based placement in its analysis, ultimately concluding that such a placement was still not permanency.

[7] Although "parent's rights are paramount" in the grounds phase, *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶22, 246 Wis. 2d 1, 29 N.W.2d 768, Sherry does not argue about the grounds phase for the termination of parental rights proceeding.

15

¶27    After a review of the record and evidence as a whole, we are confident that the circuit court considered the standard and all statutory factors in determining what was in each child's best interest.  The circuit court addressed and explained how the record evidence supported its findings with respect to each factor for each child and determined that granting the TPR petitions was in each child's best interest.  Wisconsin law does not "mandate the relative weight" to be placed on any particular factor, but rather that all factors be considered.  *State v. Margaret H.*, 234 Wis. 2d 606, ¶29.  The circuit court examined the relevant facts, applied the proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.  *Gerald O.*, 203 Wis. 2d at 152.  Accordingly, we affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

16