COURT OF APPEALS
DECISION
DATED AND FILED

March 6, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1263**

STATE OF WISCONSIN

Cir. Ct. No. 2023ME17

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE MENTAL COMMITMENT OF C.J.H.:

WINNEBAGO COUNTY,

PETITIONER-RESPONDENT,

V.

C.J.H.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Winnebago County: BRYAN D. KEBERLEIN, Judge. *Affirmed.*

¶1      LAZAR, J.[1] Carly[2] appeals from orders for her involuntary commitment under WIS. STAT. § 51.20(1)(a).2.a. and for the involuntary administration of medication and treatment under WIS. STAT. § 51.61(1)(g). Carly asserts that the circuit court committed reversible error by, over her counsel's objections, admitting hearsay evidence to establish that she was statutorily dangerous; one element of the allegedly inadmissible evidence was the physician's examination report. She then asserts that without that inadmissible hearsay evidence, Winnebago County failed to prove that she was dangerous by clear and convincing evidence. Finally, Carly contends that the County did not provide clear and convincing evidence that she is incompetent to refuse medication or treatment for her mental illness. Carly affirmatively asserts that, despite the expiration of the orders, this appeal is not moot. Thus, she contends, both orders must be reversed.

¶2      This court concludes it was not error to admit the examination report and that there was sufficient admissible evidence of dangerousness presented to the circuit court. That court's finding that Carly was substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition in order to make an informed choice as to whether to accept or refuse psychotropic medication and treatment was not clearly erroneous based upon the testimony and evidence. Both orders are affirmed.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] In order to protect her confidentiality, consistent with WIS. STAT. § 809.19(1)(g), this court refers to the subject individual by the pseudonym she selected.

## BACKGROUND

¶3 Proceedings had commenced for Carly's commitment under WIS. STAT. ch. 51 when she became uncooperative and was brought to jail. While being held at the Winnebago County Jail on a suicide watch, Carly reportedly exhibited behavior that sparked concerns that she could harm herself or the jail staff. The County filed a statement of emergency detention, which led to Carly being placed at Winnebago Mental Health Institute (WMHI), and the circuit court conducted a contested commitment hearing on February 7, 2023.

¶4 The first witness at this hearing was Dr. Marshall Bales, a psychiatrist who had examined Carly at WMHI. He testified that Carly told him she was suicidal, confirming to him that "she had wanted to be dead." Bales opined that Carly was mentally ill; she was manic and psychotic, which Bales agreed is a substantial disorder of thought, mood, and perception that has the effect of impairing Carly's judgment, behavior, and capacity to recognize reality. Bales stated that he relied on "[e]laborate records from the jail report" and the statement of detention in forming his opinion. With respect to medication, Bales agreed that a mood stabilizing medication would have a therapeutic value for Carly. He testified that he explained the advantages (including stabilization of mood), disadvantages (sedation), and alternatives (none good, although therapy and healthy living would help) with Carly. He further said that Carly continually exhibited "interruptions, disrobing, [and] yelling," and was unable to "engage in a rational or reasonable dialogue about psychotropics," which led him to believe she was not capable of expressing an understanding of the advantages, disadvantages, and alternatives to medication that he discussed with her. Bales's written report was admitted into evidence over Carly's hearsay objection.

¶5      Dr. Megan Thumann, a clinical psychologist who also evaluated Carly, testified next. She recounted Carly's statement to her that "the jail staff was upset with her for telling people how to harm themselves," and that Carly said she "found the perfect way to do it," which was to hit her head against a metal protrusion in the cell to kill herself. Thumann testified that Carly had bipolar 1 disorder and had been manic with psychotic features in her most recent episode, which is a substantial disorder of thought, mood, and perception that grossly impairs Carly's judgment, behavior, or capacity to recognize reality. She also testified that when she saw Carly, Carly was displaying "pretty aggressive and agitated behaviors" and was throwing food and trying to open a wound on her leg.

¶6      The County also called a deputy sergeant who was working at the jail when Carly was an inmate, who testified that she observed Carly "making comments about self-harm and ramming her head into a one-inch spike hook on the side of the toilet" in her cell. On cross-examination, the deputy sergeant clarified that Carly was talking about harming herself, not actually attempting to harm herself. Carly was ultimately moved to a padded cell that did not have any spike hooks prior to her being transported to WMHI.

¶7      Finally, Carly testified. She stated that she "never said [she] was going to harm [her]self ever," and that when she spoke about "ram[ming] your temple" into "that spike thing" she was simply stating that she "figured out how you can kill yourself in jail." She acknowledged that she defecated in her cell when in jail and wiped feces in the cell and on the windows but asserted this behavior was out of anger and that she is "not crazy."

¶8      In its oral ruling, the circuit court recounted testimony from Bales, including that Carly told him she was suicidal and "wanted to be dead," his

diagnosis and opinion on Carly's mental illness and treatability, and his explanation to Carly of the advantages, disadvantages, and alternatives to medication. The court also summarized Thumann's testimony regarding Carly's "threats of harm to self" and diagnosis of "bipolar 1 … manic with psychotic features." Finally, the court mentioned the sergeant's testimony about Carly's comments regarding "ramming her head into a one-inch spike on the side of a … toilet" and acknowledged Carly's own testimony. The court concluded that the statutory elements for a six-month commitment and involuntary medication had been met; specifically with regard to dangerousness, the court cited Carly's aggressiveness, the comments about self-harm from both doctors and the sergeant as well as Thumann's observation that Carly was attempting to open a wound on her leg. The orders expired on August 7, 2023. Carly appeals.

## DISCUSSION

¶9 The review of a civil commitment order—determining whether the petitioner has met its burden of proof—presents a mixed question of law and fact. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. A circuit court's findings of fact are upheld unless they are clearly erroneous, *id.*, and appellate courts will "accept reasonable inferences from the facts." *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). Whether those facts satisfy the statutory standards, however, is a question of law that is reviewed de novo. *Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901.

¶10 When considering whether a circuit court erred in the admission of evidence, "[t]he test is not whether [the appellate] court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised." *State v.*

*Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). Our supreme court has stated that "[t]he question on appeal is not whether [the appellate] court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." *Id.*; *State v. X.S.*, 2022 WI 49, ¶33, 402 Wis. 2d 481, 976 N.W.2d 425.

### I.      Mootness of the appeal

¶11     Our supreme court has determined that mental commitment appeals are not moot based upon two (or possibly three) collateral consequences. *See Sauk County v. S.A.M.*, 2022 WI 46, ¶20, ¶27 n.5, 402 Wis. 2d 379, 975 N.W.2d 162. The first consequence articulated in *S.A.M.* is that the subject individual is subject to a firearm prohibition. *Id.*, ¶23. Here, the County asserts that Carly is likely subject to a prior lifetime firearm prohibition due to a misdemeanor conviction for disorderly conduct-domestic abuse with use of a dangerous weapon pursuant to 18 U.S.C. § 922(g)(9).[3] *See Doubek v. Kaul*, 2022 WI 31, ¶7, 401 Wis. 2d 575, 973 N.W.2d 756. Be that as it may, our supreme court has determined that even a prior firearm prohibition does not necessarily render this collateral consequence inapplicable because it may impact the factors courts consider upon a petition to revoke a firearms ban. *S.A.M.*, 402 Wis. 2d 379, ¶23; *see also* WIS. STAT. § 51.20(13)(cv)1m.b.

---

[3] Carly asserts that the relevant federal statute may be held unconstitutional in the near future because the United States Supreme Court has granted certiorari in an appeal with that issue. This court notes that there are often appeals and that statutes—state or federal—could always be on the precipice of being declared unconstitutional in part or in whole. Appellate courts cannot delay issuing opinions because of what *may* occur in the future. If that were the rule, no appeals would ever be resolved.

¶12 The second collateral consequence mentioned in *S.A.M.* is that a county may seek to recoup payments from the subject individual for recovery care and medication. 402 Wis. 2d 379, ¶24; *see also* WIS. STAT. § 46.10(2). In this case, as in many (if not most), the County has not indicated that it would seek such reimbursement. Nor has Carly's counsel indicated that the County actually made a financial reimbursement demand. While this court shares the County's concern that this consequence may be illusory, instructions from our supreme court require it to hear and resolve this appeal.

¶13 Finally, Carly also hangs her hat on the most illusive of collateral consequences and asserts that a reversal would lessen the stigma associated with commitment and involuntary medication. The County points to Carly's behaviors closely tied to her mental illness, which are also in the public record of her criminal complaint from Waushara County, asserting there is no additional stigma from the orders on appeal. This court looks askance at this last collateral consequence as a whole; even our supreme court in *S.A.M.* refrained from addressing the "stigma argument." *See S.A.M.,* 402 Wis. 2d 379, ¶27 n.5; *see also id.,* ¶51 (Ziegler, C.J., concurring in part and dissenting in part) ("[N]o Wisconsin court has ever concluded that social stigma alone is a collateral consequence of commitment that will defeat the mootness doctrine.").

¶14 Finally, Carly asserts that even if the underlying appeal with respect to her commitment order is found to be moot (because it expired on August 7, 2023), her involuntary medication and treatment order is not moot under standard exceptions and because the County has not refuted her arguments on that issue, she prevails on this point. *See State v. Alexander*, 2005 WI App 231, ¶15, 287 Wis. 2d 645, 706 N.W.2d 191 ("Arguments not refuted are deemed admitted."); *Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279

N.W.2d 493 (Ct. App. 1979). This court agrees that the medication and treatment order may fall under established exceptions to the mootness doctrine not clearly addressed by the County. But having already concluded that the appeal, in general, falls within the broad ambits of nonmootness as described in *S.A.M.*, it need not address this issue. *See **Hanley Implement Co. v. Riesterer Equip., Inc.**,* 150 Wis. 2d 161, 170, 441 N.W.2d 304 (Ct. App. 1989) ("If our ruling on one ground resolves an issue, we need not address additional arguments that would provide the same relief.").

¶15     Regardless of possible mootness, this court will address the merits of Carly's appeal.

## II.     The physician's examination report was properly admitted.

¶16     Carly contends that Bales's examination report consisted of multiple layers of hearsay and should not have been admitted into the Record, nor should the circuit court have relied upon that inadmissible hearsay. That was, asserts Carly, not harmless error. The County contends that there was no error and no hearsay in Bales's testimony or his report, but that even if there were, there was still sufficient evidence in other witnesses' testimony and in Carly's own statements to support the court's finding of dangerousness and any error was harmless.

¶17     Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." WIS. STAT. § 908.01(3). It is generally inadmissible. WIS. STAT. § 908.02. But Bales testified as an expert. Under WIS. STAT. § 907.03, an expert may rely on otherwise inadmissible evidence, such as hearsay, if the evidence is of the type experts typically rely upon to form their opinions. In

the context of WIS. STAT. ch. 51 commitments, testifying expert physicians are expressly permitted to rely upon the review of an individual's treatment records, WIS. STAT. § 51.20(1)(am), and they may use that review as a basis to formulate their opinions as to the key issues in a mental commitment proceeding. *See* § 51.20(9)(a)5.

¶18 "It is well settled that it is 'proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others.'" *Walworth County v. Therese B.*, 2003 WI App 223, ¶8, 267 Wis. 2d 310, 671 N.W.2d 377 (quoting *Karl v. Employers Ins. of Wausau*, 78 Wis. 2d 284, 299, 254 N.W.2d 255 (1977)). The court in *Therese B.* noted "two important qualifications of this rule." 267 Wis. 2d 310, ¶8. "First, although WIS. STAT. § 907.03 allows an expert to base an opinion on hearsay, it does not transform the hearsay into admissible evidence." *Id.*, ¶8 (citing *State v. Watson*, 227 Wis. 2d 167, 198, 595 N.W.2d 403 (1999)). Second, it "does not give license to the proponent of an expert to use the expert solely as a conduit for the hearsay opinions of others." *Therese B.*, 267 Wis. 2d 310, ¶9 (citing *State v. Williams*, 2002 WI 58, ¶19, 253 Wis. 2d 99, 644 N.W.2d 919).

¶19 Physicians' examination reports serve two specific purposes in commitment proceedings. One is to allow the physician to support his or her expert opinions as to whether the individual is mentally ill, treatable, and able to competently refuse medication and treatment. The report outlines to the circuit court not only the expert's opinions but what formed the basis for those opinions. Secondly, the report also details the type of medication that is or has been prescribed and how the subject has responded to the same. For these reasons, it is

good practice for circuit courts to admit the examination report into the record so that those aspects can be reviewed on appeal.

¶20 Because it is true that the admissible statements considered by the expert in forming an opinion are not hearsay, circuit courts could always admit the examination reports as to the expert's opinion but subject to a possible hearsay objection with respect to the dangerousness standard. While that is splitting hairs, it is appropriate; the acceptable hearsay that underlies an opinion cannot be utilized to establish dangerousness, which requires personal testimony. Thus, Bales's report of examination was properly admitted. The question of what statements in the report are admissible and for what purposes must be addressed separately.

**III.    There was sufficient admissible evidence of dangerousness.**

¶21 Carly argues that the County offered insufficient admissible evidence to support a finding that she was statutorily dangerous. She further contends that the only evidence heard by the circuit court, excluding Bales's report, was insufficient because it showed only that she was telling others how to harm themselves, not that she was suicidal or prone to self-harm. Her argument is belied by the testimony taken at trial as well as by the admissible statements in Bales's report.

¶22 Bales testified about his discussions with Carly. Carly's statements to Bales recounted in both his testimony and his report, are not hearsay and are admissible because they are statements made by, and offered against, a party—or, in this case, a subject individual. *See* WIS. STAT. § 908.01(4)(b)1.; ***State ex rel. Kalt v. Board of Fire and Police Comm'rs for Milwaukee***, 145 Wis. 2d 504, 516, 427 N.W.2d 408 (Ct. App. 1988). Bales testified that Carly had "confirmed the

concerns leading to the detention and the events that had occurred in the jail, and she said she was suicidal." He further stated[4] that "she confirmed that she had wanted to be dead."

¶23 In addition, the deputy sergeant testified Carly was "making comments about self-harm" to the extent that the jail staff moved her to a padded cell for her safety and then to WMHI. Finally, there was testimony from Thumann regarding her observation of Carly trying to open a wound on her leg.

¶24 The circuit court aptly summarized the testimony of each witness as follows:

> I think that there is evidence that … the elements of dangerousness [are] met. I think that the testimony of the sergeant is consistent with the testimony of Dr. Bales. I think that it's consistent with what Dr. Thumann testified to regarding the need for a locked inpatient placement, the aggressiveness, and the attempting to open a wound on one's leg.

¶25 Given these first-person observations of Carly's conduct and the testimony of first-person conversations with Carly (even without the other statements in Bales's report), there is sufficient admissible evidence of Carly's dangerousness to herself. The circuit court outlined the instances of dangerousness communicated by each witness and balanced those statements against Carly's denials. The court's finding of dangerousness is the result of

---

[4] In addition to undeniable hearsay statements, Bales's report contains a narrative regarding Carly's statements to Bales regarding her suicidal state of mind: "She admitted to having made suicidal threats, including suicide by cop and moving to Colorado to 'end it.'" These statements were presented in the first person and are taken from Bales's direct conversations with Carly; they are not hearsay.

reasoned discretion and decision-making and is not clearly erroneous. *See Wollman*, 86 Wis. 2d at 464; *X.S.*, 402 Wis. 2d 481, ¶33.

### IV. The involuntary medication and treatment order was properly issued.

¶26 As a final issue, Carly asserts that the second order should be vacated because the County failed to meet its burden to prove that she was incompetent to refuse medication and treatment. First, she contends that Bales's testimony provided a conclusory opinion that did not contain the necessary details and that Thumann's testimony was likewise insufficient. Next, Carly asserts that her own testimony demonstrated that she understands her medications and can apply that understanding to make an informed choice pursuant to WIS. STAT. § 51.61(1)(g)4. Appellate courts will not disturb a circuit court's findings of fact unless they are clearly erroneous. *J.W.J.*, 375 Wis. 2d 542, ¶15. As noted previously, reasonable inferences can be relied upon, *Christopher S.*, 366 Wis. 2d 1, ¶50, and the appellate courts can search the lower court record for support, *Becker v. Zoschke*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977).

¶27 Bales explained[5] to the circuit court his efforts to discuss with Carly which and how medications would have a therapeutic value and why he believed

---

[5] Bales's report of examination further supports his opinion that involuntary medication and treatment were appropriate for Carly:

> [Carly] could not reasonably or rationally participate in the medication review. She was unable to weigh the pros and cons of psychotropics or apply the information to herself. She interrupted me. She was accusatory and defensive. She said the doctors, nurses, and her family were the ones who needed medication. She said there was nothing wrong with her. Therefore, it is my opinion with a reasonable degree of medical certainty that she is not competent to refuse psychotropic medication, and an involuntary medication order is requested.

she was not capable of expressing an understanding of the advantages, disadvantages, and alternatives to medication:

> Q    Are you asking for authorization to involuntarily medicate her with psychotropic medication?
>
> A    Yes.
>
> Q    Do you believe that [it] would have a therapeutic value for her?
>
> A    Yes.
>
> Q    What sort of medication would you be seeking? And if you could give one example of its benefits.
>
> A    Basically a mood stabilizing medication. ...
>
>      And now, there's many, and I reviewed this with her. That was when she began to disrobe and talked over me and yelled and made some sexual comments of some kind. I had multiple staff around. But she could neither express nor apply my attempt at reviewing medications with her when I met with her.
>
>      ....
>
> Q    Do you believe she's competent or incompetent to refuse medication?
>
> A    Incompetent.
>
> Q    Were the advantages, disadvantages, and alternatives of accepting medication explained to [Carly]?
>
> A    Yes. By me.
>
>      ....
>
> Q    And what, if any, alternatives were discussed with [Carly]?
>
> A    ... I said there's no good alternatives. Yes, therapy, anger management, case management. I attempted to dialogue about this, and again, it was interruptions, disrobing, yelling. Just she could not

13

> engage in a rational or reasonable dialogue about pyschotropics, but the dialogue did occur.

¶28 The circuit court made the following findings with respect to medication and Bales's efforts to explain Carly's lack of understanding:

> [Bales] testified, again, that he believed [Carly] was a proper subject for treatment. The doctor testified, regarding medications, that he did believe medications would have a therapeutic value. He believed that she was not capable of applying an understanding to herself, that she was incompetent to refuse medications. The doctor testified that he explained the advantages, disadvantages, and alternatives. He did testify that he didn't believe there were any good alternatives to the medications. The doctor testified that the medications would not unreasonably impair her ability to participate in future legal proceedings, and that, again, he believed that a mood stabilizer would be appropriate and would help with her anger, agitation, and hypersexuality.
>
> ....
>
> Given all of that consistent testimony, I will find that the elements have been met for a six-month commitment and order .... I will order, based on the testimony … of Dr. Bales, that a medication order is appropriate. I would note that Dr. Thumann's testimony was, again, consistent with Dr. Bales, that the medications have had a calming effect for [Carly] based on the doctors' testimony here today.
>
> So I do think it's not a question of whether medications would be appropriate, but whether there's medical testimony here in a court of law to support that the elements of the statute have been met, and they have. So there will be a six-month commitment with a medication order.

¶29 This finding by the circuit court is not clearly erroneous. Bales's testimony was not a parroting of the statute's language. It was specific and unique to Carly. It satisfied the requisite burden of proof.

14

**CONCLUSION**

¶30 The circuit court did not err in admitting the physician's report of examination into the record; while various hearsay statements in that report are admissible to support the physician's expert opinion but not a finding of dangerousness, other statements were admissible (nonhearsay) evidence of dangerousness. There was sufficient admissible evidence of dangerousness presented to the court. And, it was not clearly erroneous for the circuit court to find that Carly was incompetent to refuse psychotropic medication such that an involuntary medication and treatment order was appropriate.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.